797 A.2d 326 (2002)
In the Interest of A.L.D., Jr., A Minor.
Appeal of: M.D., Natural Mother, Appellant.
Children and Youth Services of Washington County, Guardian Ad Litem, A.L.D., Sr., Natural Father, Appellees.
In re: A.L.D., Jr., A Minor Child.
Appeal of: Washington County Children and Youth Services, Appellant.
M.D., Natural Mother, Appellee.
Superior Court of Pennsylvania.
Submitted January 17, 2002.
Filed April 10, 2002.
*329 Joan E. Lesnock, Washington, for M.D.
Karen Hassinger, Washington, for Guardian Ad Litem.
Dennis R. Paluso, Charleroi, for A.L.D., Sr.,
Joyce A. Hatfield-Wise, Washington, for Children and Youth Services of Washington.
Before DEL SOLE, P.J., BOWES, and KELLY, JJ. *327
*328 OPINION BY KELLY, J.:
¶ 1 In this appeal and cross-appeal of M.D., the natural mother of A.L.D., Jr. ("Mother") and Washington County Children and Youth Services ("CYS") respectively, we must determine whether the Washington County Orphans' Court erred in postponing the termination of Mother's parental rights. We must also determine whether the court erred (1) in directing Mother and CYS to make additional attempts toward the reunification of Mother and A.L.D., Jr. and (2) in providing for another hearing in six months regarding the termination of Mother's parental rights. For the following reasons, we hold that the portion of the Orphans' court order relating to Mother is inadequate and in error. Accordingly, we affirm in part, vacate in part, and remand with instructions.
¶ 2 The certified record, including the testimony presented at the termination proceedings, discloses the following relevant facts and procedural history of this case. CYS became involved with the family in January 1994, upon allegations that Mother, Father and their three-year old daughter were living under deplorable housing conditions, including assertions that their daughter was dirty and unfed *330 and the home had a gas leak. Mother and Father unofficially placed their daughter with relatives and left the home.
¶ 3 A.L.D., Jr. was born on February 21, 1994. Mother and Father were then residing in the home of Father's stepbrother, Ray Williams, and his wife, Priscilla Williams. When A.L.D., Jr. was two months old, Mother and Father moved to independent housing. Nine days later, on April 22, 1994, the court approved the emergency removal of A.L.D., Jr. and his sister, based on CYS' investigation of allegations that Father had performed sexual acts on his young nephews. A.L.D., Jr. was placed in the physical care of Priscilla and Ray Williams, which was considered a "relative" placement, under the supervision of CYS. A.L.D., Jr.'s sister was placed in foster care. Both children were adjudicated dependent and continued in their placements. A.L.D., Jr. has remained in the Williams' home since that time, and has spent virtually his entire life as part of the Williams' family. A.L.D., Jr. is now almost eight years old.
¶ 4 A criminal complaint was lodged against Father on September 13, 1994 on multiple charges of involuntary deviate sexual intercourse, aggravated indecent assault, indecent assault, rape, indecent exposure, and unlawful restraint. Father performed the acts underlying these charges on his two nephews who were under the age of sixteen. The complaints indicate that the victims were as young as three years of age at the time of the offenses, which occurred in 1986, 1990, and 1993. Father eventually pled guilty to two counts of involuntary deviate sexual intercourse and was sentenced to five to ten years' incarceration. His minimum sentence date is September 1999 and his maximum sentence date is September 2004.
¶ 5 During the next four and one-half years, CYS developed approved service plans for both Mother and Father. Mother's service plans included court orders to complete parenting classes and mental health counseling, obtain suitable housing, undergo professional evaluations, and attend scheduled visitations with A.L.D., Jr. Father's service plans included "perpetrator" counseling while incarcerated. Father was discharged from counseling due to misconduct. He has not completed his court-ordered services.
¶ 6 Over the next four and one-half years, the Juvenile court held numerous hearings to review the status of A.L.D., Jr., during which the stated goal was reunification. In May 1994 and August 1994, Mother was ordered to complete parenting classes. By 1996, Mother had not completed the services available and had not obtained housing. Mother eventually completed parenting classes in October 1996, and obtained housing. Mother continued her visits with A.L.D., Jr.
¶ 7 In 1998, A.L.D., Jr.'s foster mother reported that the child was experiencing serious problems associated with his visits with Mother. The parties entered a joint proposal to the court whereby Mother would continue with counseling and parent education, A.L.D. Jr. would remain with his foster family, and his foster mother would begin counseling. The parties further agreed to abide by the outcome of the evaluation. If the psychologist who had evaluated the child in the past determined, after a follow-up interview with the parties, that reunification was still desirable, then Mother's visitation would be increased. On the other hand, if the expert recommended against reunification, then CYS would file a petition for termination of parental rights.
¶ 8 After his review, Dr. Stephen Schachner opined that termination of parental rights was in the child's best interest. Accordingly, on December 15, 1998, the Juvenile *331 court approved the permanency plan presented by CYS, which requested a goal change to adoption and termination of parental rights. CYS then filed a petition for involuntary termination of parental rights on December 30, 1998. This petition was marked for filing on December 31, 1998 and was duly filed in the Orphans' Court Division of the Court of Common Pleas. On January 26, 1999, the termination hearing in Orphans' court was continued by court order until March 10, 1999. On March 8, 1999, the hearing was again continued until May 12, 1999. The parties obtained an additional continuance of the termination hearing until October 4, 1999.
¶ 9 Meanwhile, on June 30, 1999, Mother petitioned the Juvenile court for return of A.L.D., Jr., and sought to reverse the goal from adoption to reunification. After the review hearings held on July 26, 1999 and August 25, 1999, the trial court issued an order denying Mother's petition for return of A.L.D., Jr., continuing A.L.D., Jr. as a dependent child placed in foster care, and approving the goal of termination and adoption.
¶ 10 Mother filed an appeal from the Juvenile court's decision. Based upon the record and the testimony presented at the July 26, 1999 and August 25, 1999 review hearings, this Court affirmed the Juvenile court's order approving the continued goal of termination of parental rights and denying Mother's request to change the goal to reunification. See In the Interest of A.L.D., 777 A.2d 513 (Pa.Super.2001) (unpublished memorandum).[1]
¶ 11 While that appeal was still pending before this Court, the termination hearings commenced in the Orphans' Court Division on October 4, 1999. The Orphans' court held additional hearings on October 12, 1999, November 8, 1999, September 25, 2000, February 1, 2001, and March 14, 2001, at which time the court admitted the exhibits, including this Court's memorandum opinion affirming the goal change. The termination record was then closed.
¶ 12 At the termination hearings, CYS presented the testimony of Cynthia Cummings, Base Service Unit Director of Centerville Clinic, Kathleen Cooper, A.L.D., Jr.'s kindergarten teacher, and Kelly Joseph, CYS caseworker. Ms. Cummings testified that the record diagnosis for A.L.D., Jr. involves an adjustment reaction disorder as a result of visitation with Mother. This disorder manifests as hyperactivity, attention-span difficulties, aggressive play, and self-abusive behavior. Ms. Cummings stated her opinion that A.L.D., Jr. needs a sense of permanency with respect to his living situation. (N.T. Hearing, 10/4/99, at 5-28). Kathleen Cooper testified to the child's disruptive behavior in the classroom and palpable tension on visiting days, his resistance to visitation with Mother, and the risks associated with his academic progress as a result of his conflict. (N.T. Hearing, 11/8/99, at 38-53).
¶ 13 The testimony of Kelly Joseph was the most extensive, during which she related the history of the case, CYS' involvement with the family, the history of Mother's response to court-ordered service plans, and visitation issues. She confirmed that A.L.D., Jr. was initially removed from the parents because Mother' was unwilling to leave Father and obtain independent housing, despite the sexual abuse charges pending against Father. Ms. Joseph stated that A.L.D., Jr. remained in placement because Mother did not demonstrate reasonable promptness in *332 completing the services plans and/or unreasonably delayed completing them. Ms. Joseph acknowledged Mother's transportation difficulties related to visitation, but pointed out that over the years, CYS consistently provided more transportation for Mother than is regularly provided or required. Ms. Joseph also stated that Mother was simply reluctant to use public transportation, insisting instead that CYS provide personal transportation service because personal transportation is not otherwise available to Mother.
¶ 14 Additionally, Ms. Joseph related that Mother maintains her relationship with Father. Although Mother does not visit Father in prison, she and Father regularly correspond. At one point, Mother requested CYS to assist her in bringing the children to visit Father in prison or, in the alternative, having Father brought to her home for visits with the children. According to Ms. Joseph, Mother continues to deny Father's guilt and, despite recent assertions to the contrary, there is strong reason to believe that Mother intends to reunite with Father, upon his release from prison.
¶ 15 Ms. Joseph also questioned Mother's ability to protect A.L.D., Jr., in light of Mother's decision to leave her other child in the care of the maternal grandmother. Mother knew that the grandmother had tried to harm the granddaughter when she was just an infant. The grandmother also had a history of abuse against Mother as a child. Grandmother has been diagnosed as suffering from atypical paranoid schizoid disorder. Although Mother was warned against leaving her child with the grandmother, she left her daughter in this woman's care consistently over a period of six months. Meanwhile, Mother assured CYS that the grandmother was not caring for her daughter, and deceived CYS about the length of time the grandmother was actually in the home. In fact, a review hearing was held solely on that matter.
¶ 16 Further, Ms. Joseph emphasized A.L.D., Jr.'s attachment to his current placement and Mother's lack of understanding and failure to appreciate that attachment. Ms. Joseph also indicated that A.L.D., Jr. was suffering as a result of having to go back and forth between the households. Ms. Joseph sought to distinguish CYS' decision to reunite Mother and her older child, stating that Mother and the older child had formed a bond during the three years prior to her placement, whereas, A.L.D., Jr. has lived consistently in Mother's care for only nine days during his infancy. (Id., 11/8/99, at 58-145). Following this testimony, CYS rested its case.
¶ 17 Mother presented testimony on her behalf from Colleen Fry, her daughter's former foster parent. Ms. Fry testified she has observed Mother approximately ten times and asserted that Mother is a "good mother" and an "honest person." She admitted that Mother's daughter had eventually been removed from Ms. Fry's foster care because of marital discord in the Fry home. Ms. Fry no longer acts as a foster parent. Ms. Fry also conceded she did not know any of the circumstances that necessitated the children's foster care placement. Nevertheless, based on her observations, Ms. Fry concluded that Mother has good parenting skills. (Id., 9/25/00, at 151-81).
¶ 18 Next, Mr. Michael Peton testified on Mother's behalf as to the interactions between Mother and A.L.D., Jr. Mr. Peton is the pastor of Mother's church. He claimed he has given supportive counseling to Mother, individually and in group sessions, and has observed Mother as a responsible parent toward her daughter and son. He stated he believed Mother would keep the children safe. He conceded that *333 he would be concerned if a parent refused to reconcile herself to her husband's guilt in light of his guilty plea to sexual assault. Mr. Peton admitted that Mother struggled with accepting Father's guilt. He agreed that the church members would be willing to assist Mother with her transportation problems. (Id. at 181-223).
¶ 19 Ms. Jody Long testified for Mother as her next-door neighbor, who had seen A.L.D., Jr. when he was dropped off at Mother's home for visitation. She stated the child's hair had not been combed, he was unkempt, and wore clothes that were too small for him. Her observations were made from October 1999 to August 2000. Ms. Long also testified that during visits with his Mother, A.J.D., Jr. regularly asked to leave his Mother's home to come and play with Ms. Long's five-year-old son. (Id. at 222-33).
¶ 20 At the next scheduled hearing, on February 1, 2001, Mother called Kathryn Bryan. Ms. Bryan testified that she attends church with Mother every Sunday. She has known Mother for about fifteen months. From her observations once a week at church, Ms. Bryan testified that Mother and son have what she considered a loving relationship. She admitted that she had not seen A.J.D., Jr. with his Mother for nearly nine months and that she had never seen him interacting with Priscilla Williams. (Id., 2/1/01, at 244-52).
¶ 21 Mother's next witness was Ms. Sherry Waters, another of Mother's friends from church. She stated that Mother provides her son with clothes, toys, books, and other things. She described Mother's relationship with her son as very loving and no different from that of Mother and her daughter. Ms. Waters described both children as outgoing and eager to please. (Id. at 252-61).
¶ 22 Mother then called Ms. Priscilla Williams to the stand. She testified she began keeping a diary of events after unsupervised visitations with Mother commenced. Ms. Williams reviewed A.J.D., Jr.'s medical problems and doctor visits that eventually led to the child's psychological evaluation and diagnosis of adjustment disorder. Ms. Williams admitted writing to Father and assuring him that he would be a part of his son's life if Father would agree to allow them to adopt his son. She also admitted she does not like Mother. Ms. Williams conceded she too found the allegations against Father difficult to believe. With regard to Mother's efforts to visit with her son, Ms. Williams said Mother makes no efforts without transportation being provided. Ms. William categorically denied all allegations that she tried to alienate son and Mother or that she interfered with the natural development of a healthy relationship between them. (Id. at 261-328).
¶ 23 At the next hearing, on March 14, 2001, Mother took the stand. She testified that she and Father were married on June 2, 1990, and that she had known Father for six months before marrying him. Mother tried to explain why she has not exercised all of her visitation rights with her son, claiming that her failure to see him was primarily due to lack of transportation. At first, she did not even have money to visit. Mother now receives public assistance. Although Mother had been granted up to ten hours a week with her son, she saw him only two hours per week. Essentially, Mother stated the transportation problems were simply "beyond my control." Mother requested Sunday visitation, but could not provide transportation. She claimed she could not visit with her son during the week because she had to be available for her daughter. She also requested Saturday visitation, but only if CYS would provide transportation. Mother further stated that the hours listed in *334 the court's order limited or prevented her from exercising her visitation rights. Mother claimed she had never been informed of her son's problems and did not experience them when he was with her. Mother also explained she had not yet filed for a divorce from Father, because she could not afford it financially. Mother admitted she is still in contact with Father. (Id., 3/14/01, at 331-416).
¶ 24 In rebuttal, CYS presented the testimony of Ms. Cathy Fritch, a transportation case aide for CYS. Ms. Fritch was responsible for transporting A.J.D., Jr. to and from many visits with his Mother. She stated that it was quite unusual for CYS to provide transportation for all visits. She further stated that the child never requested more visits. Kelly Joseph was recalled to the stand. She testified that information obtained from Father led her to believe Mother and Father maintained regular contact via letter; the maternal grandmother tried to smother their daughter when the child was one-month old; Mother had been beaten by grandmother when Mother was a child; and it was Father's intention to move back in with Mother and the children upon his release from prison. (Id. at 416-33).
¶ 25 Finally, Father testified. He stated that Mother knew he had been involved in criminal activity but not the specifics of that activity. Mother knew Father had to occasionally leave the home but did not know it was because he had sexual urges with respect to his baby daughter. Father confirmed his intention to move back in with Mother and the children, after he is released from prison. (Id. at 437-44).
¶ 26 Following deliberation, the Orphans' court entered the order presently under review, which in relevant part states:
[U]pon consideration of the hearings and the submission of briefs by counsel, it is hereby further ORDERED and DECREED that the parental rights of [the natural Mother] shall not be terminated at this time. Children and Youth Services (CYS) has seen fit to reunite Mother and Daughter, a sibling of A.D.L., Jr. A renewed effort should be made to reunite the Mother and Son. The attempt at reunification of this family has languished due to the failure of both Mother and CYS to aggressively pursue the steps necessary to accomplish it. Each shall make additional attempts toward the goal of reunification and allow the termination court to revisit this issue in six months.
(See Trial Court Order, dated April 27, 2001, at 2.) Both Mother and CYS filed appeals.[2] CYS also presented a motion for stay of the court's April 27th order. By order dated June 18, 2001, the court stayed the April 27th order pending resolution of the parties' appeals.
¶ 27 On appeal at No. 903 WDA 2001, Mother raises two issues:
WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW BY DENYING THE PETITION OF THE AGENCY TO TERMINATE THE PARENTAL RIGHTS OF THE NATURAL MOTHER?[3]
WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW BY *335 REQUIRING THAT THE AGENCY MAKE RENEWED EFFORTS TO REUNITE THE MOTHER AND SON AND ALLOW THE ORPHANS' COURT TO REVISIT THE ISSUE OF TERMINATION IN SIX MONTHS?
(Mother's Brief at 5).
¶ 28 In its cross-appeal at No. 929 WDA 2001, CYS raises the following issues:
WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW AND OF FACT WHEN IT FAILED TO FIND BY CLEAR AND CONVINCING EVIDENCE THAT STATUTORY GROUNDS FOR THE INVOLUNTARY TERMINATION OF THE PARENTAL RIGHTS OF THE BIRTH MOTHER HAVE BEEN MET AND FAILED TO INVOLUNTARILY TERMINATE THE PARENTAL RIGHTS OF THE BIRTH MOTHER? WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW AND OF FACT WHEN IT FAILED TO GIVE PRIMARY CONSIDERATION TO THE DEVELOPMENTAL, PHYSICAL AND EMOTIONAL NEEDS AND WELFARE OF THE MINOR CHILD AND FAILED TO FIND BY CLEAR AND CONVINCING EVIDENCE THAT THE INVOLUNTARY TERMINATION OF THE PARENTAL RIGHTS OF THE BIRTH MOTHER BEST SERVED THE NEEDS AND WELFARE OF THE MINOR CHILD?
WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW WHEN IT ORDERED FURTHER REUNIFICATION EFFORTS TO BE MADE WHEN THE ISSUE OF REUNIFICATION WAS NOT WITHIN THE JURISDICTION OF THE ORPHANS' COURT AND WAS BARRED BY THE DOCTRINE OF RES JUDICATA?

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW UNDER 23 Pa.C.S.A. SECTION 2511(b) WHEN IT ORDERED SUBSEQUENT ADDITIONAL EFFORTS TO BE REVIEWED BY THE TRIAL COURT IN SIX MONTHS?
WHETHER THE MOTHER'S APPEAL SHOULD BE DISMISSED ON ITS MERITS WHEN THE FACTS AVERRED BY THE MOTHER ARE NOT SUPPORTED IN THE RECORD BELOW?
(CYS' Brief at 1-2).
¶ 29 Preliminarily, we note the Section 2511 of the Adoption Act governs the involuntary termination of parental rights, and the general equity and the Orphans' Court procedural rules apply to these proceedings. See generally In re J.J.F., 729 A.2d 79, 81 (Pa.Super.1999). Pursuant to amendment effective January 1, 2001, the Supreme Court Orphans' Court Rules, Rule 7.1 provides: "No exceptions shall be filed to any order in involuntary termination or adoption matters under the Adoption Act, 23 Pa.C.S. Section 2501, et seq." Pennsylvania Orphans' Court Rule 7.1(e). Accordingly, the present appeals of Mother and CYS, filed May 23, 2001 and May 24, 2001, are properly before us without the filing of exceptions, as all decrees in termination of parental rights cases are now considered final, appealable orders.[4]Id.
*336 ¶ 30 Appellate review of Orphans' court orders in termination of parental rights cases implicates the following principles:
In cases of involuntary termination of parental rights, the standard of appellate review is limited to the determination of whether the decree of the Orphans' court is supported by competent evidence. Where the hearing court's findings are supported by competent evidence of record, "we must affirm the hearing court even though the record could support an opposite result."
* * * * * *
In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of grounds for doing so. The standard of "clear and convincing" evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.
In re Adoption of Atencio, 539 Pa. 161, 165-66, 650 A.2d 1064, 1066 (1994) (internal citations omitted). Our Supreme Court has stated that an abuse of discretion occurs "when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." Id. (quoting Morrison, et al. v. Commonwealth of Pennsylvania, Department of Public Welfare, et al., 538 Pa. 122, 135, 646 A.2d 565, 571-572 (1994)).
¶ 31 The Petition for Involuntary Termination of Mother's and Father's Parental Rights in the present case was based upon the following subsections of 23 Pa.C.S.A. § 2511:

SUBCHAPTER B. INVOLUNTARY TERMINATION

§ 2511. Grounds for involuntary termination
(a) General rule.The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
* * * * * *
*337 (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
* * * * * *
(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
* * * * * *
(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
(b) Other considerations.The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
* * * * * *
23 Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8); (b). As the party seeking involuntary termination of Mother's and Father's parental rights, CYS bore the burden of establishing by clear and convincing evidence that the stated grounds for doing so existed. In the Interest of B.L.L., 787 A.2d 1007, 1010 (2001). The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. In Matter of Adoption of C.A.W., 453 Pa.Super. 277, 683 A.2d 911 (1996), appeal denied, 548 Pa. 631, 694 A.2d 619 (1996). To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. Id. See also In re Julissa O., 746 A.2d 1137 (Pa.Super.2000). The Orphans' court "must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination." Matter of Adoption of Charles E.D.M., II, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998).
¶ 32 On appeal, this Court has the duty to ensure that the Orphans' court has satisfactorily fulfilled its requirements of examining the competent, relevant evidentiary resources. In re Adoption of B.G.S., 418 Pa.Super. 588, 614 A.2d 1161 (1992), appeal discontinued, 535 Pa. 628, 631 A.2d 1002 (1993). This duty also involves review of the Orphans' court's action *338 in the case, its findings of fact and conclusions of law; the resolution of its evidentiary conflicts, however, will not be disturbed unless they lack support in the record or represent an abuse of discretion or error of law. In re Baby Boy S., 420 Pa.Super. 37, 615 A.2d 1355 (1992), appeal granted, 535 Pa. 623, 629 A.2d 1383 (1993), appeal dismissed as improvidently granted, 540 Pa. 302, 657 A.2d 484 (1995). For example, Pennsylvania law allows the admission in these proceedings of a lay witness' testimony on a party's parental capability, when that testimony is based on personal observation. Id. Evidence of the parent's family history of mental illness and involvement with the welfare system is also relevant and admissible regarding issues of family stability or lack of a social support system to assist the parent with the child. Id. Significantly, evidence concerning a parent's ability to care for another child is irrelevant and inadmissible in a proceeding to terminate parental rights with regard to the child at issue. Id.; Julissa O., supra. See also In re Adoption of M.A.R., 405 Pa.Super. 131, 591 A.2d 1133 (1991) (rejecting as irrelevant evidence that another child may or may not be well cared for by parent subject to termination petition).
¶ 33 Mother argues that CYS placed her son in the home of a relative of Father, although Father is a perpetrator of deviate sexual abuse against children, and permitted those relatives to interfere with, prevent, and attempt to destroy the relationship between Mother and her son.[5] Mother claims these relatives have an ongoing relationship with Father and assured Father they would allow him to have a part in his son's life upon Father's release from jail. Mother further asserts that these same relatives have actively endeavored to prevent reunification of son and Mother to the point where CYS has sought to terminate Mother's parental rights. Mother maintains CYS has failed to present clear and convincing evidence that her parental rights should be involuntarily terminated. Mother concludes the Orphans' court correctly denied CYS' petition.
¶ 34 Mother further reasons that reunification is the natural consequence of the court's refusal to terminate her parental rights and that reunification properly belongs in the Juvenile Division of the Court of Common Pleas. Mother complains that the Orphans' court erred in failing to transfer the matter back to Juvenile Division to supervise the reunification efforts. Moreover, Mother contends that once the Orphans' court determined CYS did not meet the statutory requirements to terminate her parental rights, any subsequent termination is now barred by the doctrine of res judicata. Consequently, Mother insists that the Orphans' court may not make further inquiry into the best interests of the child or assert the right to revisit the issue of termination in six months. Mother concludes that the Orphans' court erred to the extent it reserved jurisdiction to revisit the issue of termination.
¶ 35 In response, and in its own right on cross-appeal, CYS argues that it presented clear and convincing statutory grounds for the involuntary termination of Mother's parental rights. CYS maintains that the court erred as a matter of law and fact when it declined to terminate Mother's parental rights in light of the competent evidence presented on that issue.
*339 ¶ 36 CYS further asserts that the court abused its discretion and erred as a matter of law when it ordered additional efforts toward the reunification of Mother and son, which the court would review in six months, because the issue of reunification was not before the Orphans' court. CYS contends the doctrine of res judicata is now a bar to the issue of reunification, in light of this Court's affirmance on appeal of Juvenile court's order, confirming the goal change to termination and adoption. CYS also questions the Orphans' court's review of Mother's efforts subsequent to the filing of the petition for termination, which is specifically prohibited by statute and case law. CYS concludes that the Orphans' court order under review is in error. We agree.
¶ 37 Pennsylvania law makes clear:
In a change of goal proceeding, the [Juvenile] court must focus on the child and determine the goal in the child's best interest.... In a termination proceeding, the focus is on the conduct of the parents. Termination is controlled by the statutory requirements of 23 Pa.C.S. § 2511. Changing the goal to adoption does not terminate the natural parents' rights, although it is a step in that direction.
In the Interest of M.B., 449 Pa.Super. 507, 674 A.2d 702, 705 (1996), appeal denied, 547 Pa. 717, 688 A.2d 172 (1997). As this Court has stated:
Thus, the importance of the service plan and the goal it identifies cannot be overemphasized.
* * * * * *
[T]he decision to allow CYS to change the service plan goal from reunification to adoption is not merely a minor decision permitting a slight shift in the emphasis of CYS' social services. As a practical and legal matter, an order by the juvenile court changing the child's placement goal from reunification to adoption ends any dispute that may exist between CYS and the parent as to the adequacy of CYS' services aimed at reuniting the parent with his/her children and, of course, as to whether CYS had selected the most appropriate goal for this family. By allowing CYS to change its goal to adoption, the trial court has decided that CYS has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition. In other words, the trial court order is the decision that allows CYS to give up on the parent.
In the Interest of M.B., 388 Pa.Super. 381, 565 A.2d 804, 807-08 (1989), appeal denied, 527 Pa. 601, 589 A.2d 692 (1990) (emphasis added).
¶ 38 As a general matter, the adjudication of dependency and the propriety of the placement goal lie within the auspices of the Juvenile Court Division of the Court of Common Pleas, not with the Orphans' court Division. Id. at 809. Thus, in the context of dependency, it is the Juvenile court that can reconsider its order and change the service plan goal back to reunification, not the Orphans' court. Id. at 808.
¶ 39 In a termination proceeding, however, the focus of the Orphans' court is whether CYS has satisfactorily borne its statutory burden for termination under Section 2511; not to review the previous Juvenile court proceedings or change the service plan goal, because the service plan goal is not the issue before the Orphans' court. Id. The Orphans' court's jurisdiction to terminate parental rights is derived from a different statute. Id. Thus, in this context, the issues and purposes of the *340 proceedings before the Juvenile Court and the Orphans' Court are wholly distinct. Id.
¶ 40 Moreover, an agency is not required to provide services indefinitely if a parent is either unable or unwilling to apply the instruction given. In re R.T., 778 A.2d 670 (Pa.Super.2001). The goal of intervention is to rehabilitate the family and reunite the child with his family, or to terminate parental rights and free the child for adoption, if reasonable efforts over an appropriate period of time have failed. In Interest of Lilley, 719 A.2d 327 (Pa.Super.1998). Therefore, CYS' duties must have reasonable limits. Id. "If a parent fails to cooperate or appears incapable of benefiting from reasonable efforts supplied over a realistic period of time, the agency has fulfilled its mandate and upon proof of satisfaction of the reasonable good faith effort, the termination petition may be granted." Id. at 332.
¶ 41 On the other hand, actions by any person or entity aimed at thwarting the maintenance of a parental relationship cannot be tolerated. Adoption of M.S., 445 Pa.Super. 177, 664 A.2d 1370 (1995). If a parent makes reasonable efforts to overcome obstacles to the preservation of her parental relationship, then a mere showing that she could have done what she did more promptly does not justify termination. Id.
¶ 42 Nevertheless, adequate parenting requires "action as well as intent." In re J.W., 396 Pa.Super. 379, 578 A.2d 952, 959 (1990). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." Id. Although the Commonwealth is willing to take on the obligation "to help parents assume their irreducible minimum parental responsibilities," that obligation "is not indefinite nor has the Commonwealth made itself guarantor of the success of the efforts to help parents assume their parental duties." Id. Thus, a parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. Id.
¶ 43 In the instant case, the Orphans' court order under review specifically terminated Father's parental rights, and that decision is no longer reviewable, as Father has failed to pursue his appeal. Therefore, that portion of the court's April 27th order shall remain intact.
¶ 44 Our concern, however, lies with the remainder of the Orphans' court decision, temporarily refusing to terminate Mother's rights, failing to make findings of fact and conclusions of law with respect to that decision, ordering Mother and CYS to renew reunification efforts, and subjecting the decision to postpone termination to a six-month review.
¶ 45 We have painstakingly reviewed and previously outlined the testimony and evidence presented at the termination proceeding. In view of that evidence, and specifically this Court's affirmance of the goal change to adoption, we conclude that the portion of the Orphans' court order relating to Mother is inadequate and in error. See In re Adoption of Atencio, supra.
¶ 46 With respect to CYS' evidence, the agency has been actively involved in the restoration of this family for over four and one-half years, without success. Mother, on the other hand, boldly continues to characterize CYS' efforts as obstructionistic. Mother blames CYS and Priscilla Williams for her own delay in coming to terms with her situation. Meanwhile, Mother appears to expect door-to-door service, complaining that any other suggested *341 alternative is "beyond her control." The record makes clear that it has been Mother's personal choices that have delayed her independence from the agency. Most notable of those decisions is Mother's continued refusal to accept Father's sex offender status and its ramifications, and her denial of the gravity of the maternal grandmother's mental illness. These two people are key players in Mother's support system and are completely unavailable to assist her. See In re Baby Boy S., supra.
¶ 47 Additionally, we note the appearance in the record and especially the stated reliance of the Orphans' court on evidence that is irrelevant; namely, testimony regarding Mother's ability to care for her daughter. This evidence was irrelevant in the proceedings related to the termination of Mother's parental rights with regard to her son. See id.; Julissa O., supra; M.A.R, supra. Despite the irrelevancy of that evidence in these particular proceedings, the only reason the Orphans' court gave for its decision to delay the termination of Mother's parental rights, and to order more efforts toward reunification, is that the daughter had been returned to Mother.
¶ 48 With regard to the court's directive for further efforts at reunification, we conclude that the court exceeded its jurisdiction. See M.B., supra, 565 A.2d at 807-08. The adequacy of CYS' efforts toward reunification is not a valid consideration at this stage, as the law allows CYS to "give up on the parent" once the service plan goal has been changed to adoption. Id. Thus, we conclude the Orphans' court order of April 27th is erroneous. Accordingly, we vacate and remand for reconsideration that part of the April 27th order addressing the termination of Mother's parental rights. Notwithstanding natural sympathies for parents who may be permanently separated from their children, the focus of this case on remand must center on Mother's lack of compliance with the service plans and her explanations for failing to comply with reasonable promptitude. The competent evidence of record contains a number of serious examples of Mother's inability, refusal, or unreasonable expectations regarding compliance.
¶ 49 Hence, upon remand the court is instructed to review only the competent evidence of record, to limit its consideration to the issues properly before it in the termination proceeding, to make its own findings of fact and conclusions of law,[6] and to consider the significance of this Court's affirmance of the goal change to adoption, which is now law of the case. The Orphans' court is directed to conclude the matter in a prompt and expeditious manner. Nothing in this decision, however, shall be construed as an express or implied approval or validation regarding the placement of A.L.D., Jr. in the *342 Williams' home. That issue is for another day.
¶ 50 Based upon the foregoing reasoning, we hold that the portion of the Orphans' court order relating to Mother is inadequate and in error. Accordingly, we affirm in part, vacate in part, and remand with instructions.
¶ 51 Order affirmed in part and vacated in part; case remanded with instructions. Jurisdiction is relinquished.
NOTES
[1] This Court's decision was filed on March 13, 2001 and provided to the Orphans' court at the close of the termination proceedings on March 14, 2001.
[2] Although the Orphans' court docket entries indicate that Father also filed a notice of appeal from the April 27, 2001 order terminating his parental rights, we have carefully reviewed this Court's docket entries and see no record of an appeal or brief filed on behalf of Father. Therefore, that portion of the April 27th order involuntarily terminating Father's parental rights is no longer subject to review.
[3] We have transcribed Mother's issue exactly as she has phrased it in her brief on appeal.
[4] We are aware of this Court's recent decision, In re C.G., 791 A.2d 430, 2002 PA Super 23 (2002). In that case, the mother had filed exceptions to the court's adjudication and decree nisi of February 21, 2001. On April 3, 2001, the court denied the exceptions and filed a final decree dated April 4, 2001, terminating the parental rights of both the mother and father. The mother filed her appeal on May 2, 2001. This Court sua sponte raised the timeliness of the appeal. This Court declined to deem the mother's appeal untimely under the amended Rule. The Court held that the amended Rule "should not be applied to termination proceedings that were still ongoing at the time the new Rule became effective. However, we further note that this Rule will be strictly applied in all future cases where the hearing on the termination petition began after January 1, 2001." Id. at ¶ 10.

In the instant case, the termination hearings commenced in the Orphans' Court Division on October 4, 1999. The Orphans' court held additional hearings on October 12, 1999, November 8, 1999, September 25, 2000, February 1, 2001, and March 14, 2001, at which time the court admitted the exhibits and closed the termination record. The court issued its order on April 27, 2001 and, without filing exceptions, Mother and CYS filed their appeals on May 23 and 24, 2001. Thus, the termination proceedings in the present case were also still ongoing at the time the new Rule became effective. The holding In re C.G. was no doubt intended to excuse the delay in filing the appeal, caused by the filing of the mother's exceptions. Nevertheless, the holding in In re C.G. could also be read literally to compel the filing of exceptions in this case. Under the circumstances of this case, we decline to read In re C.G. so broadly as to require the filing of exceptions, which were no longer required under the applicable amended Rule at the time these appeals were taken.
[5] Mother's point here is somewhat disingenuous, given her own inability to disengage from Father, which inability caused the placement to begin with; it simultaneously ignores the fact that Mother initially agreed to the placement.
[6] We encourage the court to make its own findings of fact and conclusions of law and to refrain from the wholesale adoption, or incorporation by reference, of the proposed findings of fact and conclusions of law of any of the parties. See generally Commonwealth v. Williams, 557 Pa. 207, 732 A.2d 1167 (1999) (recognizing finite resources of trial courts and degree of flexibility in rules of court allowing judges, where appropriate, to refer to record where reasons may be found for decisions; rejecting wholesale adoption of one advocate's position at critical stage of proceedings; calling for autonomous judicial expression of reasons for decision); C.W. v. K.A.W., 774 A.2d 745 (Pa.Super.2001) (admonishing trial court in custody proceeding for improper delegation of judicial powers, where court relied on guardian ad litem for advice on evidentiary rulings and issued order closely following guardian's recommendations on same day as guardian submitted recommendations to court).