J-S26015-16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: ADOPTION OF: J.J.L.,      :      IN THE SUPERIOR COURT OF
      :              PENNSYLVANIA
      :
      :
      :
      :
      :
APPEAL OF: W.D., FATHER      :
      :
      :      No. 3280 EDA 2015

Appeal from the Decree entered on September 10, 2015
in the Court of Common Pleas of Montgomery County,
Orphans' Court Division, No(s): 2015-A0072

BEFORE:  OLSON, STABILE, and STRASSBURGER,* JJ.

MEMORANDUM BY OLSON, J.:      **FILED APRIL 26, 2016**

W.D. ("Birth Father") appeals from the decree entered on September 10, 2015 involuntarily terminating his parental rights to his son, J.J.L. ("Child"), born in January 2014.[1]  We affirm.

The trial court accurately summarized the factual background of this case as follows:

> [Child] was born [in January 2014] and was immediately transferred to the hospital [neonatal intensive care unit] experiencing symptoms of withdrawal.  [Mother] admitted to using heroin for a period of three or more months during her pregnancy with [C]hild.  [The Office of Children and Youth ("OCY")] received legal custody of [C]hild on February 18, 2014, prior to his discharge from the hospital on February 19, 2014, and he was placed in foster care.  The evidence introduced by

---

[1] On that same day, the trial court terminated the parental rights of J.S., Child's birth mother ("Mother") and J.L., who was Child's presumptive father by virtue of a signed acknowledgment of paternity.  These parties are not parties to this appeal.

* Retired Senior Judge assigned to the Superior Court

OCY established a long history of drug abuse by [Mother], beginning when she was a teenager, a history of domestic violence between [Mother and Birth Father], significant periods of incarceration for both [Mother and Birth Father], and significant mental health issues for [Birth Father].

* * *

[M]other's step-mother and father currently have custody of [Mother]'s two older children, one of whom is also a child of [Birth Father]. Birth [F]ather's mother and father share physical custody by informal agreement . . . of [Mother]'s older children.

* * *

[Birth Father] testified at the hearing on July 1, 2015 that he would like his parents to be considered by OCY as an adoptive resource or as caregivers for [Child]. In their own testimony, neither [Mother] nor [B]irth [F]ather asserted that either of them is capable currently of providing a home and 24 hour care for [Child].

[Birth Father] has been in prison since February of 2014, shortly after [Child]'s birth, has never seen nor interacted with [C]hild (except for one occasion in juvenile court), and has not sent letters, pictures[,] or gifts to [Child. Mother] testified that during her pregnancy in 2013 she told [Birth Father] that he might be the father of the child. [Birth Father] testified that [M]other had told him on various occasions in 2013 and 2014 that he was the father and that he was not the father. Both [M]other's step-mother and [B]irth [F]ather's mother also testified that they had been told, by either [Mother or Birth Father], that [Birth Father] might be the [biological] father. Despite this uncertainty, [Birth Father] took no action from the time of [C]hild's birth until February of 2015 to communicate with OCY about [Child], to identify himself as a possible [biological] father, to request DNA testing to confirm his paternity, or even to request any information or an opportunity to participate in juvenile court hearings about [Child]'s placement. Nor did [B]irth [F]ather provide any support for [Child].

[M]other did not initially advise OCY that a person other than J.L. might be the [biological] father of [Child]. In November of

2014, [M]other indicated for the first time to the OCY caseworker that she did not believe J.L. was the [biological] father of [Child]. OCY requested paternity testing of J.L., with the result that J.L. was excluded as the father of [Child], whereupon OCY requested a DNA test of [Birth Father]. OCY offered in evidence the DNA test as Exhibit OCY-10, which reflects that the test results confirm that [the] probability that [Birth Father] is the father of [Child] is 99.999%. At the time these DNA test results were received, [Birth Father] remained incarcerated. The OCY caseworker testified that she had difficulty corresponding and communicating with [Birth Father] shortly after the time these DNA test results were received, because he was moved from SCI Graterford, to SCI Camp Hill, and then to SCI Dallas.

[Birth Father] learned in February of 2015 of the positive DNA test confirming that he is the [biological] father of [Child]. . . . In April of 2015, [Birth Father] wrote to the case worker stating that he did not wish to relinquish his parental rights.

OCY established that [Birth Father] has a lengthy criminal history, with 13 arrests since age 14 or 15. [Birth Father] acknowledged that he has been arrested approximately 11 or 12 times since his [older] son's date of birth [in] 2007. He also acknowledged that he has been incarcerated for significant periods and he is currently serving a prison sentence of one to three years[' imprisonment] that may stretch until February 28 of 2017, by which time [Child] will be over 3 years old.

Trial Court Opinion, 9/10/15, at 5-10.

The procedural history of this case is as follows. On April 8, 2015, OCY filed a petition to terminate Birth Father's parental rights as to Child. On July 1, 2015, the trial court held a hearing on the petition. On

September 10, 2015, the trial court terminated Birth Father's parental rights. This timely appeal followed.[2]

Birth Father raises one issue for our review:

[Whether t]he trial court erred when it terminated [Birth] Father's parental rights where he was incarcerated and did not learn that he was, in fact, [C]hild's father until four months prior to the hearing to decide the termination of his parental rights?

Birth Father's Brief at 2.

As this Court has stated:

In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. Our

_____

[2] Birth Father failed to file a concise statement of errors complained of on appeal ("concise statement") contemporaneously with his notice of appeal. *See* Pa.R.A.P. 1925(a)(2)(i). On October 13, 2015, Birth Father filed his concise statement. As OCY does not assert prejudice from Birth Father's late concise statement, and neither the trial court nor this Court directed Birth Father to file a concise statement by a certain date, we do not find his issue waived. *See In re K.T.E.L.*, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that there is no *per se* rule mandating quashal or dismissal of a defective notice of appeal in children's fast track cases). Birth Father's lone issue on appeal was included in his concise statement.

scope of review is limited to determining whether the trial court's order is supported by competent evidence.

*In re Adoption of G.L.L.*, 124 A.3d 344, 346 (Pa. Super. 2015) (internal quotation marks and citations omitted).

The trial court terminated Birth Father's parental rights under 25 Pa.C.S.A. §§ 2511(a)(2) and (b) which provide as follows:

**§ 2511. Grounds for involuntary termination**

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511.

The focus in terminating parental rights under section 2511(a) is on the parent, but, under section 2511(b), the focus is on the child. *In re*

*Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). As this Court explained,

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect[,] or refusal; (2) such incapacity, abuse, neglect[,] or refusal has caused the child to be without essential parental care, control[,] or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied. The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (internal quotation marks and citation omitted). A parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

We agree with the trial court that the evidence presented at the termination hearing proved by clear and convincing evidence that Birth Father is incapable of parenting Child. As a preliminary matter, it is undisputed that Birth Father is currently incarcerated and incapable of caring for Child. Furthermore, although Birth Father was told that he was possibly Child's father in 2013, he did not attempt to ascertain whether he was Child's father until after OCY contacted him and conducted a paternity test.

Except for one brief encounter in juvenile court, Birth Father never saw nor interacted with Child. He has not provided for Child's material or psychological needs. Birth Father failed to use the opportunities available to him in prison to make sincere efforts at creating and maintaining a place of importance in Child's life.

This is not the first time that Birth Father failed to care for a child he conceived with Mother. As noted above, Birth Father and Mother have an older child together. Even when he was not incarcerated, Birth Father failed to properly provide for his older child and that child is currently living with his grandparents. Instead, Birth Father chose to live a life of crime and was arrested one dozen times over an eight-year timespan. In this light, Birth Father's untimely vow to provide for Child was properly rejected by the trial court. *See A.L.D.* 797 A.2d at 340.

Birth Father argues that the short period of time between February 28, 2015, the date he learned the results of the paternity test, and April 8, 2015, when OCY filed the termination petition, did not afford him sufficient time to demonstrate his desire and ability to parent Child, and made it impossible for the trial court to properly determine whether there was sufficient evidence to terminate his parental rights under section 2511(a)(2). Birth Father contends that, under the circumstances, it was unreasonable for the trial court to expect an incarcerated individual to undertake the duties and obligations of a parent.

This argument lacks merit. As noted above, although Birth Father only received confirmation that he was Child's biological father in February 2015, he was aware in 2013 that there was a likelihood that he was Child's biological father and he failed to ascertain whether he was in fact Child's biological father and failed to carry out any parental duties during this time. Furthermore, it does not take an extended period of time to send cards, notes, pictures, etc. Even after Birth Father was notified that he was Child's biological father, he failed to send any such cards, notes, or pictures to Child. In *A.L.D.*, this Court held that a parent must act diligently to undertake full parental responsibilities. *A.L.D.*, 797 A.2d at 337. In this case, Birth Father failed to act diligently. Thus, the trial court properly rejected Birth Father's late action. *See id.* at 340.

Birth Father relies primarily on *In Re P.S.S.C.*, 32 A.3d 1281 (Pa. Super. 2011), *appeal denied*, 38 A.3d 826 (Pa. 2012), in support of his argument that the trial court acted too hastily. In that case, this Court reversed the termination of parental rights because all of the notices sent to the father were in English and the father spoke only Spanish. This Court found that the father in *P.S.S.C.* attempted to use the resources available to him in prison; however, there were no resources available to a Spanish speaking father unrepresented by counsel. *Id.* at 1286. In this case, Birth Father had resources available to him in prison, *e.g.*, the prison mail system, which he could utilize to maintain a bond with Child. He failed to do so.

This makes this case more similar to ***Adoption of Baby Boy A. v. Catholic Soc. Servs. of Diocese of Harrisburg, Pa., Inc.***, 517 A.2d 1244 (Pa. 1986). In that case, our Supreme Court affirmed the termination of parental rights of an illiterate father who failed to take advantage of the opportunities available to him in order to maintain a relationship with his son. ***Id.*** at 1245-1246. In this case, Birth Father had opportunities to establish and maintain a bond with Child from the time prior to his imprisonment, when he knew that there was a possibility that he was Child's biological father, through the filing of the termination petition. His prolonged failure to generate a bond with Child make his April 2015 letters to OCY expressing his interest in asserting parental rights nonpersuasive. As such, we conclude that OCY proved by clear and convincing evidence that section 2511(a)(2) was satisfied.

Next, we review the termination of Birth Father's parental rights under section 2511(b). This Court explained:

> If the grounds for termination under subsection (a) are met, a court shall give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child. The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability. [Our Supreme] Court [has] held that the determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond.

***In re K.H.B.***, 107 A.3d 175, 180 (Pa. Super. 2014) (internal alterations, quotation marks, and citations omitted).

- 9 -

We conclude that the trial court's finding that termination would be in the best interest of Child is supported by the record. Birth Father only met Child once, in juvenile court, and has no bond whatsoever with Child. Child has lived with his foster parents since birth and has developed a bond with his foster parents. Child has also developed a bond with his brother and half-sibling, who also live with Child's foster parents. The foster parents have provided a loving, caring, and safe environment for Child free from the dangers of crime and drug abuse. Thus, the developmental, physical, and emotional needs and welfare of Child are best served by terminating Birth Father's parental rights. As such, OCY proved by clear and convincing evidence that section 2511(a)(2) and (b) were satisfied. Accordingly, we affirm the trial court's decree terminating Birth Father's parental rights.

Decree affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/26/2016