J-S52037-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.K.D., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.D., SR., FATHER | : | No. 537 MDA 2018 |

Appeal from the Decree Entered March 6, 2018
in the Court of Common Pleas of Dauphin County
Orphans' Court at No(s):  11 AD 2018
CP-22-DP-0000059-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: B.K.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.D., SR., FATHER | : | No. 543 MDA 2018 |

Appeal from the Decree Entered March 6, 2018
in the Court of Common Pleas of Dauphin County
Orphans' Court at No(s):  12 AD 2018
CP-22-DP-0000060-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: K.M.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.D., SR., FATHER | : | No. 544 MDA 2018 |

Appeal from the Decree Entered March 7, 2018
in the Court of Common Pleas of Dauphin County
Orphans' Court at No(s):  13 AD 2018
CP-22-DP-0000061-2015

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.: **FILED: NOVEMBER 9, 2018**

B.D., Sr. (Father) appeals from the decrees entered March 6, 2018,

and March 7, 2018, which terminated involuntarily his parental rights to his

*Retired Senior Judge assigned to the Superior Court.

minor children, B.K.D., Jr., a male born in March 2004, B.K.D., a male born in May 2010, and K.M.D., a female born in February 2012 (collectively, Children).[1,2]  After review, we affirm.

_____

[1] The orphans' court entered separate decrees on the same dates terminating involuntarily the parental rights of K.D. (Mother).  Mother did not appeal the termination of her parental rights.

[2] The decrees granted the Agency's petitions for goal change to adoption and the involuntary termination of parental rights.  **See** Decree of Involuntary Termination of Parental Rights (B.K.D., Jr.), 3/6/2018 ("[U]pon consideration of the Petition … for a goal change to adoption … said petition is hereby GRANTED[.]") (emphasis omitted); Decree of Involuntary Termination of Parental Rights (B.K.D.), 3/6/2018 (same); Decree of Involuntary Termination of Parental Rights (K.M.D.), 3/7/2018 (same).  In each of his notices of appeal relating to Children, Father states he is appealing "the [o]rder dated February 27, 2018.  This order has been entered in the docket, as evidenced by the attached copy of the docket entry."  Notice of Appeals (B.K.D., Jr., B.K.D., and K.M.D.), 3/29/2018.  Father attached copies of the orphans' court docket to his notices of appeal, but did not attach copies of the juvenile court docket.  In addition, because Father filed his notices of appeal with the register of wills and clerk of orphans' court only, this Court did not receive a certified copy of the dependency record.

To the extent the court entered separate goal change orders, we need not review them.  Father has waived all arguments with respect to a change in Children's goals as his brief on appeal contains no substantive discussion of that issue.  **See In re W.H.**, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) ("Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").  Moreover, in light of our disposition affirming the termination of Father's parental rights to Children, any purported challenge to the goal change orders is moot.  **See In re D.A.**, 801 A.2d 614, 616 (Pa. Super. 2002) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.").

*(Footnote Continued Next Page)*

Dauphin County Social Services for Children and Youth (the Agency) has a lengthy history of involvement with this family dating back to 2006. N.T., 2/27/2018, at 24. Between April 2006 and November 2014, the Agency received thirteen referrals raising numerous concerns. *Id.* at 24-32. Among these concerns were inappropriate parental discipline, including Father's verbal abuse and violent behavior toward Children, such as punching and hitting with a belt; Father's refusal to cooperate with the Agency; Father's multiple threats to kill a caseworker, resulting in his guilty plea to criminal charges; neglect of Children, including Children's poor hygiene, K.M.D.'s extremely soiled diapers, failure to obtain medical care, and lack of food, resulting in K.M.D.'s dehydration, malnourishment, lethargy, and lack of weight gain; and poor and unsanitary home conditions, including black mold, cockroaches, mice, leaking roof, water damage, lack of proper heating, heaters falling off the wall, missing ceiling tiles, and a missing window; and heating the home with an oven, which resulted in burns to Children. *Id.*

_____
*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Finally, we note that, to the extent the court entered separate goal change orders, the correct procedure is to file separate notices of appeal for each order and decree. *See* Pa.R.A.P. 341, Note ("Where … one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."); *see also* *Commonwealth v. Walker*, 185 A.3d 969, 977 (Pa. 2018).

Relevant to this appeal, the Agency received a referral on December 5, 2014, raising concerns regarding Children's lack of supervision, food, winter clothing, and diapers, poor hygiene, and poor home conditions. *Id.* at 33. When the Agency conducted an unannounced home visit, Father was uncooperative. He told caseworkers that Mother and the two younger children were living with relatives in Halifax, and that the oldest child was living with relatives in Harrisburg. *Id.* at 38. The Agency later discovered that B.K.D., Jr. had been suspended from school. Upon his return to school, the Agency attempted to determine where he was living, but B.K.D., Jr. refused to share that information. *Id.* at 38-39. The Agency made multiple attempts to return to the home and continued its efforts to locate the two younger children. *Id.*

While assessing the December 5, 2014 referral, the Agency received another referral on February 17, 2015, raising concerns regarding physical abuse and poor home conditions, including lack of water and electricity. *Id.* at 39-40. The Agency tried to investigate, but Father and Mother refused its requests to see Children.[3] *Id.* at 38-40. As a result, the Agency obtained

_____

[3] The record revealed that

> [t]he Agency visited the home accompanied by police. No one answered the door. The caseworker learned that Mother and Father sat in their parked vehicle with K.M.D. nearby and watched the activity at their house. K.M.D. was not secured in a car seat and lacked a coat and shoes [in the winter]. The

*(Footnote Continued Next Page)*

custody of Children on February 19, 2015, and the juvenile court adjudicated them dependent on April 29, 2015.[4]  *Id.* at 23, 40.

Children have resided in foster care since February 2015.  Throughout Children's time in foster care, Father failed to make sufficient progress to rectify the issues that prevented him from caring for Children.  Father struggled with mental health issues and refused to comply with his court-ordered psychological evaluation for over a year, resulting in suspended visitations with Children until he obtained the evaluation.  *Id.* at 87.  Once he obtained the evaluation, it recommended that Father participate in marriage counseling and individual counseling.  He attended the first two marriage counseling sessions, but failed to complete the program.  *Id.*  He also attended individual counseling, but was "on-again/off-again" in terms of his participation.[5]  *Id.* at 87-88.

*(Footnote Continued)* ───────────────────

> [c]ourt issued a pick-up order for all three Children.  Police took immediate custody of K.M.D.

Orphan's Court Opinion, 6/7/2018, at 4 (citing N.T., 2/27/2018 at 40-41). The record does not indicate B.K.D. and B.K.D., Jr.'s location at that time. *See* N.T., 2/27/2018, at 41.

[4] The Agency continued to receive referrals even after Children entered foster care, resulting in a total of 22 referrals relating to Father and Mother. N.T., 2/27/2018, at 24, 34-37.

[5] The record indicates that Father attended therapy inconsistently with his first provider, resulting in an unsuccessful discharge in April 2017.  N.T., 2/27/2018, at 14.  Through the February 2018 hearing date, he has been
*(Footnote Continued Next Page)*

While the Agency referred Father and Mother to start reunification services in August 2016, by the next month, the reunification team closed services for noncompliance with attendance. *Id.* at 82.

Father continually denied the Agency access to the home, including an eight month stretch from January 2017 to September 2017. *Id.* at 74-75, 83. While some repairs were made to the home, most were not. *Id.* at 77. Father had no income and failed to provide proof of payment for monthly utilities. *Id.* at 80, 86, 90. Father repeatedly refused to cooperate with the Agency, including failing to return phone calls and text messages, providing an incorrect phone number when asked for updated contact information, and refusing to provide emergency contact information. *Id.* at 83, 86. A caseworker testified that Father displayed a generally hostile attitude and that at "[a]lmost every encounter that I've had with [Father], he becomes loud and agitated. You know, he presents as if he's yelling." *Id.* at 84.

Father's visits with Children were suspended for lengthy periods of time, including from January 2016 to September 2016 with B.K.D. and K.M.D., and from January 2016 to November 2017 with B.K.D., Jr. *Id.* at 91. Once visits resumed with B.K.D. and K.M.D., Father attended the majority of scheduled visits, but he was often late, necessitating a letter

*(Footnote Continued)* ─────────────

consistent with individual counseling since he began with his current provider in July 2017. *Id.* at 57-58.

from the counseling center cautioning Father that timely attendance at visits was required or they would be canceled. *Id.* at 81, 92. Even after the letter, two of Father's visits were canceled because he showed up late. *Id.*

After Children had spent nearly three years in foster care, on January 26, 2018 the Agency filed petitions to terminate involuntarily Father's parental rights to Children.[6] The orphans' court held a hearing on February 27, 2018.

_____

[6] Guardian *ad litem* (GAL), Sarah E. Hoffman, Esquire, represented Children in the dependency proceedings. On February 15, 2018, Attorney Hoffman filed a motion requesting that the orphans' court appoint separate counsel for B.K.D., Jr. in the termination proceedings. She averred that B.K.D., Jr. expressed conflicting views regarding termination and that a conflict may exist between his legal and best interests. The court granted the motion and appointed Joy Waters Fleming, Esquire to represent B.K.D., Jr.'s legal interests. On February 23, 2018, Attorney Hoffman filed motions requesting that the court appoint her as counsel for B.K.D. and K.M.D. in the termination proceedings, in which she averred that no conflict existed between their legal and best interests. Once again, the court granted the motions.

At the start of the hearing, Attorneys Fleming and Hoffman presented statements on the record clarifying Children's legal interests. Attorney Fleming stated that B.K.D., Jr. "has indicated that he would like to be adopted by a family and be included in a family environment for the rest of his childhood and have the opportunity to live in a community setting …." N.T., 2/27/2018, at 2. Attorney Hoffman stated that termination of parental rights and adoption would satisfy both the legal and best interests of B.K.D. and K.M.D. *Id.* at 3. While neither Attorney Fleming nor Hoffman filed briefs in this Court arguing on behalf of Children's legal interests, they submitted letters in which they expressed their support for the termination of Father's parental rights.

At the conclusion of the hearing that day, the court announced its decision to terminate Father's rights to Children. The court entered decrees terminating Father's rights to B.K.D., Jr. and B.K.D. on March 6, 2018, and entered a decree terminating Father's rights to K.M.D. on March 7, 2018. Father timely filed notices of appeal on March 29, 2018, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The family court filed its opinion on June 7, 2018.

On appeal, Father claims the orphans' court erred in terminating his parental rights to Children.[7] We begin with our standard of review and the applicable law.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

---

[7] Father also claims the court erred in changing Children's goal to adoption. As discussed *supra*, Father has waived any challenge to a change in Children's goals.

Termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to subsections 2511(a)(1), (2), (5), (8), and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the

- 9 -

incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).

First, Father claims that the orphans' court erred in terminating his parental rights pursuant to 23 Pa.C.S. § 2511(a). Father's Brief at 5, 12. However, Father waived any challenge to subsection 2511(a) by failing to include it in his concise statements of errors complained of on appeal. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]ssues not included in an appellant's … concise statement of errors complained of on appeal are waived."). Father's concise statements were identical and included only a single claim relating to the termination of his parental rights, in which he asserts that the orphans' court erred by concluding that termination would be in Children's best interests. Thus, we review only the court's decision to terminate pursuant to subsection 2511(b).[8] The requisite analysis is as follows.

_____

[8] Even if Father had preserved a challenge to subsection 2511(a), we agree with the orphans' court that the Agency met its burden under subsection 2511(a)(8). *See* Orphans' Court Opinion, 6/7/2018, at 14. The record supports the orphan courts' finding that

> Children were removed from Father's care on February 19, 2015, and have remained in foster care since that time. Therefore, more than 12 months have elapsed since the date of placement. The record is nearly devoid of evidence of Father's efforts in or progress toward addressing the problems which required [] Children's placement.
>
> Father presented evidence of having obtained psychological treatment. [The orphans' court] find[s] it significant that

*(Footnote Continued Next Page)*

S[ubs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*(Footnote Continued)* —————————————

Father failed to undergo evaluation and treatment for more than a year after directed to do so. "[P]arents are required to make diligent efforts toward the reasonably prompt assumption of parental responsibilities." **In re A.L.D.**, 797 A.2d 326, 340 (Pa. Super. 2002). "[A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." **Id.** (citation omitted).

**Id.** at 14-15; **see also** N.T., 2/27/2018, at 114, 119-20. As discussed *supra*, our review of the record demonstrates that the conditions which led to the removal of Children continue to exist, and further, as discussed *infra*, termination of Father's parental rights would best serve the needs and welfare of Children. **See** 23 Pa.C.S. § 2511(a)(8).

- 12 –

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

In its opinion, the orphans' court concluded that the Agency presented clear and convincing evidence to support the involuntary termination of Father's parental rights under subsection 2511(b). Orphans' Court Opinion, 6/7/2018, at 15-16. The court found no evidence of a bond between Children and Father, and that termination would not be detrimental to Children. *Id.* at 16. It reasoned that Children are doing well in foster care, and that it would be detrimental to return them to Father. *Id.*

Father argues that terminating his parental rights would be contrary to Children's best interests. In a single sentence in the summary of the argument section of his brief, Father contends that he has a significant bond with Children. Father's Brief at 8.

Our review of the record supports the findings of the orphans' court. With respect to Children's relationship with Father, Caseworker Jade Folk testified that the court suspended visitation starting in January 2016, until Father obtained a psychological evaluation. N.T., 2/27/2018, at 91.

B.K.D. and K.M.D. have been residing together in a pre-adoptive placement since July 2015. *Id.* at 96-97. After Father's visits with B.K.D. and K.M.D. resumed in September 2016, he participated in the visitation consistently, although he was late to 14 of the 46 total visits. *Id.* at 91-92,

112. During visits, B.K.D. and K.M.D. sometimes said they loved Father and gave him hugs, but according to Ms. Folk, they seemed "to be more excited to either be playing in the tumble room or the activity room than actually having any type of [] meaningful engagement[.]" *Id.* at 99. There was a lack of interaction between Father, B.K.D., and K.M.D., and he struggled to redirect their behaviors. *Id.* at 99-100.

With respect to B.K.D., Jr., the court suspended Father's visitation with B.K.D., Jr. for close to two years, from January 2016 until November 2017. Initially, the visits were suspended because Father refused to undergo a psychological assessment. However, they continued to be suspended even after Father was assessed because Father's inappropriate behavior and statements to B.K.D., Jr. were causing him mental distress. *Id.* at 91. As Ms. Folk testified,

> [B.K.D., Jr.] had multiple psychiatric hospitalizations and there were reports that [Father] was saying things to him during visits such as that the [A]gency is lying to him, don't believe them, you know, like those types of things which was then causing [B.K.D., Jr.] some anger and some self-injurious behavior which then led to the psychiatric hospitalizations.

*Id.* at 91; *see also id.* at 95-96. B.K.D., Jr. currently resides in a group home where he was placed following a psychiatric hospitalization. *Id.* at 94-95. Since he was placed in the group home and Father's visits were suspended, he has not had any further hospitalizations. Ms. Folk testified that B.K.D., Jr. has "really matured. He is doing well in the group home

setting. He's insightful, and he is able to accept responsibility for his own actions." *Id.* at 95. Academically, B.K.D., Jr. has also shown marked improvement. Previously, he had multiple disciplinary actions at school, but as Ms. Folk testified, during the 2017-18 school year, "he has done exceptionally well. He is receiving high As and his behaviors are phenomenal. He has received first honors in both marking periods, the first quarter and second, and he was also awarded the student of the month. He has really turned himself around." *Id.* at 95.

By the time of the hearing, Father had visited with B.K.D., Jr. twice since visits had resumed. *Id.* at 92. Ms. Folk acknowledged that B.K.D., Jr. would like to maintain contact with Father if possible. *Id.* at 101. She explained, "[w]e've discussed what that would look like once termination occurs up until he's 18 and what his choice, you know, would be at the age of 18." *Id.* Ms. Folk testified that "the agency's goal [is] to locate an adoptive family for [B.K.D., Jr.] so he is not [in the group home] long term." *Id.* at 94. The foster mother to B.K.D. and K.M.D. is willing to consider having B.K.D., Jr. placed in her home and Ms. Folk testified at the hearing that she was exploring that option with the foster mother. *Id.* at 96-97.

Significantly, Ms. Folk did not believe that terminating Father's parental rights would be detrimental to or negatively impact any of Children. *Id.* at 100-01. She opined that Father's relationship with Children is not a parent-child relationship, but rather, appeared to be more "like a friendship"

- 15 –

than a bond the majority of the time. *Id.* at 100. In contrast, she opined that B.K.D. and K.M.D. share a bond with their pre-adoptive foster mother. *Id.* at 98. She explained that they "seek the foster parent out for any comfort, nurturing that they need. I have heard them spontaneously call her mom. I've seen both [K.M.D.] and [B.K.D.] crawl up on her lap for snuggles and hugs, and it appears like a great relationship." *Id.* at 98. Ms. Folk opined that terminating Father's parental rights will meet Children's developmental, physical and emotional needs. *Id.* at 101.

Moreover, clinical psychologist Howard Rosen, Ph.D., conducted a psychological evaluation of Father, and opined, *inter alia*, that Father's age and personality disorders indicate a poor prognosis for Father's improvement. *Id.* at 119. Dr. Rosen opined that Children will benefit from stability and permanence and that reunification is not in their best interests *Id.* at 120.

Thus, the record demonstrates that the orphans' court did not abuse its discretion in concluding that terminating Father's parental rights would best serve the needs and welfare of Children. By the time of the termination hearing, Children had been in foster care for three years, and Father remained incapable of caring for them in a safe and appropriate manner despite 12 years of Agency services. *See In re T.S.M.*, 71 A.3d at 270 ("The Supreme Court cautioned against using the goal of reunification "to prolong instability for children when it becomes clear that parents will be

unable to provide their children's basic needs in the near future."). Indeed, the record reveals he has exacerbated the harm suffered by Children, especially the psychiatric hospitalizations of B.K.D., Jr., which were attributed at least in part to Father's behavior. To the extent Father argues that he has a bond with Children, the record belies this claim. The record supports the orphans' court's finding that he has more of a friendship with Children than a bond. Counsel for all three Children reported that Children prefer to be adopted. N.T., 2/27/2018, at 2-3. The evidence confirms that termination would not be detrimental to them. B.K.D. and K.M.D. reside in a pre-adoptive foster home and share a bond with their foster mother. Father's relationship with B.K.D., Jr. is tenuous, given that no visits occurred for nearly two years and Father has a history of interfering with B.K.D., Jr.'s psychological and behavioral progress. The group home has provided B.K.D., Jr. with safety and stability, allowing him to start to resolve serious behavior problems and attain academic success, and he may possibly be placed in the same home with siblings.[9]

_____

[9] While B.K.D., Jr. is not in a pre-adoptive placement, our Supreme Court explained in *In re T.S.M.* that

> the Adoption Act specifically provides that a pending adoption is not a prerequisite to termination of parental rights involving agencies...: "If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor

*(Footnote Continued Next Page)*

Based on the foregoing, we conclude that the orphans' court did not commit an abuse of discretion by terminating Father's parental rights to Children involuntarily, and we affirm the court's March 6, 2018, and March 7, 2018 decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/9/2018

_(Footnote Continued)_ ────────────────

> that a person with a present intention to adopt exists." 23 Pa.C.S. § 2512(b).

71 A.3d at 268. Further, the Supreme Court recognized that "termination may improve the likelihood of finding an adoptive home. Indeed, in some cases, a child's bond with a parent, who has proven incapable of caring for the child, may impede the child's ability to attach to a pre-adoptive family who can provide the needed care and stability." **Id.** at 268 (citations omitted). Thus, it was within the orphans' court's discretion to terminate Father's rights even though B.K.D., Jr. was not in a pre-adoptive placement.