J-S42009-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 208 MDA 2018 |

Appeal from the Decree Entered December 29, 2017
In the Court of Common Pleas of Northumberland County Orphans' Court
at No(s):  Adoptee # 9 of 2015

BEFORE:   BOWES, J., McLAUGHLIN, J., and STRASSBURGER*, J.

MEMORANDUM BY BOWES, J.:                    **FILED FEBRUARY 21, 2019**

E.G. ("Mother") appeals from the orphans' court decree entered December 29, 2017, that granted the petition filed by Northumberland County Children and Youth Social Service ("CYS") to involuntarily terminate her parental rights to her minor son, C.K.[1]  We affirm.[2]

---

[1]  In separate decrees, the orphans' court terminated the parental rights of J.K., the legal father, and M.C., the biological father.  Neither man appealed the respective decree or participated in this appeal.

[2] This panel originally filed a memorandum on September 19, 2018, that vacated the decree and remanded for further proceedings.  On November 13, 2018, we granted panel reconsideration, withdrew that filing, and directed C.K.'s counsel to file a brief that states C.K.'s legal interest and advocates in a manner that serves that interest.  Counsel complied, indicating that his client desires the termination of Mother's rights.  We file this memorandum in light of the argument presented in counsel's brief.

---

*   Retired Senior Judge assigned to the Superior Court.

CYS became involved with C.K. shortly after his birth in October 2012, after Mother reacted violently to the hospital staff's recommendations regarding her care for the newborn. N.T., 7/6/16, at 6. During the ensuing tantrum, Mother tossed objects around her hospital room and threw items at staff. *Id*. at 6-7. Following the discharge of Mother and C.K. from the hospital, CYS offered Mother a parenting service, a referral for early head start, and a recommendation for mental health and medication management services. *Id*. at 7. Mother initially cooperated with CYS, but she subsequently became uncooperative, going so far as to move temporarily from Northumberland County to avoid CYS's involvement. *Id*. at 8-9.

Thereafter, CYS received a referral alleging Mother was drinking, using marijuana, and abusing prescription medication in her Northumberland County home. *Id*. at 10-11. When Sarah Austin, a CYS caseworker, attempted to investigate the accusations, Mother slammed the door in her face. *Id*. at 11. While Ms. Austin waited outside the home, the police arrived in response to a coinciding domestic dispute among Mother, Mother's brother, and her brother's girlfriend. *Id*. After the police intervened, Ms. Austin went into the home and attempted to administer a drug test on Mother, who refused. However, Mother conceded that a drug test would show that she ingested morphine. *Id*.

In addition to Mother's obstinacy regarding the drug screens, Ms. Austin observed that Mother's home was extremely cluttered and had safety hazards

strewn across the floor. *Id*. As it was clear that agency-intervention was necessary, Ms. Austin offered Mother a safety plan if she could identify someone who would be appropriate to supervise Mother's contact with C.K. *Id*. at 12. However, Mother refused to identify anyone because she did not want C.K. removed from her custody. *Id*. at 12-13. Accordingly, CYS obtained an emergency order for temporary custody. Upon learning of that development, Mother became violent, shattered the living room window, and threatened to commit suicide. *Id*. at 13. Following the incident, Sunbury Community Hospital admitted Mother for twenty days as a psychiatric patient. *Id*. at 14. On December 18, 2013, the juvenile court adjudicated C.K. dependent. N.T., 11/12/15, Exhibit 1. Since October 2015, C.K. has been in kinship foster care with his former daycare provider, and he visits his maternal grandmother twice per month.

On March 17, 2015, CYS filed a petition for the involuntary termination of Mother's parental rights to C.K. pursuant to 23 Pa.C.S. § 2511(a) and (b). The orphans' court conducted hearings on November 12, 2015, July 6, and August 31, 2016, and July 19, 2017.[3] Rachel Wiest-Benner, Esquire, served

---

[3] Plainly, the two–and-one-half-year timeline presented in this case is unacceptable insofar as it flouts our Supreme Court's mandate that courts resolve children's fast track cases expeditiously. *See In re T.S.M.*, 71 A.3d 251, 256 n.12 (Pa. 2013) ("An eight month delay between the filing of a termination petition and a hearing thereon, without some explanation is inconsistent with the best practices for dependent children in need of permanency."). While the most recent delays were due to the necessity of a

as C.K.'s guardian *ad litem*, and appeared at each hearing. In response to our High Court's then-new holding in ***In re Adoption of L.B.M.***, 161 A.3d 172, 183 (Pa. 2017), on April 10, 2017, the orphans' court appointed Brian Ulmer, Esquire, as legal counsel for C.K.

During the evidentiary hearings, CYS presented the testimony of two psychiatrists, Andrei Nemoianu, MD, and William Rakauskas, MD; a psychologist, Kasey Shienvold, Psy.D.; and several agency case workers who worked with the family. Mother testified on her own behalf. Collectively, the mental health experts established that Mother was diagnosed with manic depression and a psychotic disorder not otherwise specified, with a rule out of

---

court-ordered competency evaluation and Mother's decision to abscond from the termination proceeding, those interruptions do not explain the remaining delays that plagued this case throughout.

Indeed, our review of the certified record reveals that the orphans' court granted the parties five separate requests for continuances that delayed the proceedings by 306 days. The case was delayed an additional ninety days when the trial court administrator reassigned it to a different orphans' court judge, who subsequently recused during January 2016. Approximately three months later, the current orphans' court judge continued the case until June 2016. Hence, whether through administrative inefficiencies or the orphans' court's liberal grant of continuances, resolution was postponed 396 days.

Furthermore, in addition to the foregoing interruptions, the certified record also discloses an unexplained gap of **five and one-half months** between the penultimate hearing on August 31, 2016, and the ensuing order dated February 14, 2017, that scheduled the final hearing for March 26, 2017. Thus, even ignoring all of the delay attributable to the various continuances, Mother's disappearance, and the competency evaluation, the case was needlessly delayed 168 days without explanation. This scenario is intolerable.

bipolar one disorder and a rule out of schizoaffective disorder bipolar type. They also confirmed that, although Mother's mental illness will require continuous mental health management, Mother failed to take her prescribed medication and her mental health treatment was inconsistent. Significantly, Dr. Shienvold testified about an incident during which Mother informed him that she has had "conversations with the radio in which the radio would respond to her." N.T. 11/12/15, at 146. Upon further inquiry, Mother also recalled occasional hallucinations where she has conversations with the Holy Spirit, who talks to her through different inanimate objects. *Id*.

As it relates to Mother's arguments herein, Dr. Shienvold also discussed the bonding assessment that he performed between C.K. and Mother, and concluded within a reasonable degree of psychological certainty that C.K. did not have a healthy attachment with Mother that would be detrimental to the child to sever. *Id*. at 151. He explained that the hallmarks of a healthy parent-child attachment are "excitement and affection upon first seeing somebody . . . and then a small level of distress upon . . . separation[,] [including] actual tears depending on the age of the child." *Id*. at 148. He continued that "those relationships are formed early on." *Id*. Dr. Shienvold testified that C.K. did not display those characteristics in his interactions with Mother. *Id*. Rather, "the child separated from [Mother] easily . . . without getting upset and was not distressed at all when [Mother] left [him] with the foster parents[.]" *Id*. at 147.

In sum, Dr. Shienvold opined that a secure, healthy attachment was absent due to destabilizers created by Mother's history of mental illness, continued substance abuse, flawed interpersonal relationships, and significantly, the prolonged duration of C.K.s' placement in foster care at a tender age. *Id*. at 150-151. Dr. Shienvold phrased it succinctly, "[C.K.] has spent a greater level of time developing attachments with the foster family than with the biological parents." *Id*. at 151.

On December 29, 2017, the orphans' court entered a decree terminating Mother's parental rights to C.K. in accordance with § 2511(a)(2) and (b).[4] Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal. She presents two issues for our review:

> I. Whether the trial court erred in determining that Northumberland County Children and Youth Services presented clear and convincing evidence that grounds for involuntary termination exist?
>
> II. Whether the trial court erred in determining that the best interests of the child would be served by terminating parental rights?

Mother's brief at 6.

First, we must ensure that C.K. was provided the legal representation to which he was entitled, an issue that we address *sua sponte*. *In re K.J.H.*, 180 A.3d 411 (Pa.Super. 2018) (holding that this Court must determine *sua*

---

[4] The orphans' court considered the dependency record in its determination. However, only limited portions of the dependency record are contained in the certified record.

*sponte* whether 23 Pa.C.S. § 2313(a) was satisfied). Pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, which our Supreme Court has defined as a child's preferred outcome. **In re T.S.**, 192 A.3d 1080 (Pa. 2018) (citing **In re Adoption of L.B.M.**, *supra*). However, an attorney who is acting as guardian *ad litem* in the dependency proceedings may also serve as legal counsel where there is no conflict between child's best and legal interests. **Id**. at 1092-93.

As the orphans' court did not appoint Attorney Ulmer until April of 2017, C.K. had the benefit of § 2313(a) counsel for only one of the four proceedings in the contested termination case, the July 19, 2017 hearing.[5] However, Attorney Wiest-Benner served as the child's guardian *ad litem* and represented his best interest at all four termination hearings. Thus, to the extent that C.K.'s legal interest coincided with his best interest, C.K. received the legal representation to which he was entitled pursuant to § 2313(a). If however, a conflict existed between his legal and best interests, then C.K. was

_____

[5] At the conclusion of the July 19, 2017 hearing, the orphans' court held the record open to determine why Mother did not appear. By order dated September 27, 2017, the orphans' court closed the record, finding Mother's proffered excuse, that she was physically unable to travel to the courthouse as a result of being "frozen" by a "severe anxiety attack," was insufficient to continue the hearing.

entitled to separate counsel to advocate his legal interests during the three hearings that preceded Attorney Ulmer's appointment.

Instantly, Attorney Ulmer advised this Court that C.K. preferred the termination of his Mother's parental rights, presumably after interviewing the child, and he filed a brief advocating that position. **See** Appellant's brief at 1. Thus, C.K.'s legal interest not only coincides with what has been determined to be his best interest, it is consistent with the result of the prior termination of parental rights proceedings. Accordingly, Attorney Wiest-Benner's conflict-free representation of C.K. at the first three evidentiary hearings satisfied § 2313(a) as it relates to those proceedings. **See In re T.S.**, **supra** at 1093 ("23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings."). Furthermore, since Attorney Ulmer advocated during the July 2017 hearing in favor of what was subsequently confirmed to be C.K.'s preferred outcome, we need not remand the matter for further proceedings. **See In re Adoption of T.M.L.M.**, 184 A.3d 585, 591 (Pa.Super. 2018) (ordering that the trial court shall conduct a new hearing only if it serves the "substantive purpose" of providing the child with the opportunity to advance his legal interest through new counsel). Thus, we address the merits of Mother's appeal.

We review Mother's claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

As noted *supra*, the orphans' court terminated Mother's parental rights pursuant to § 2511(a)(2) and (b). The relevant sections provide:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

Our Supreme Court set forth our inquiry under § 2511(a)(2) as follows:

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa.Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id*. at 340.

Mother does not raise any specific allegations of orphans' court error as it relates the court's review under § 2511(a)(2) and (b). Indeed, both of the arguments that she asserts in the statement of questions presented assail the weight that the orphans' court attributed to CYS's evidence generally. Mother's contentions are replete with generalized supposition. For example, Mother opines that her references to her conversations with the Holy Spirit through her radio may have been "a figure of speech" rather than evidence of an hallucination. *See* Mother's brief at 10. Similarly, she challenges Dr. Nemoianu's testimony regarding a comparable hallucination emanating from a disconnected air-conditioner by suggesting "it is entirely plausible" that Mother actually heard a noise emanate from the appliance and that "[t]here

is no way for the court to be certain that in was [a hallucination, and] not an actual event producing noise." *Id*. at 11.

Mother continues this line of reasoning against Dr. Shienvold's testimony, but only after she first attempted to impeach his opinions by highlighting the fact that CYS paid him to conduct the bonding assessment and that, due to the reality of foster placement at an early age, in the preponderance of cases that he reviews, he does not discern a significant healthy attachment between parent and child that would have a negative impact on the child if severed. *Id*. at 16. In this vein, Mother supposes that the psychologist's conclusion is faulty because "*it would appear* that C.K. and [Mother] *may very well* have a healthy attachment" because they played well together and the child separated from Mother easily when he returned to his foster family. *Id*. at 13-14 (emphases added). Ultimately, Mother opines that Dr. Shienvold's methodology was "problematical" because the child did not demonstrate fear or apprehension from Mother during the bonding assessment. *Id*. at 15. She revisits the identical argument in relation to the trial court's consideration of Dr. Shienvold's conclusion in its needs and welfare analysis. *Id*. at 21-22. For the following reasons, Mother's suppositions are unavailing.

Notwithstanding her qualified contentions of error based upon explanations that are "entirely plausible," "would appear to be the case," or "may very well" have happened, Mother is seeking to have this Court reweigh

the evidence in a light more favorable to her and to substitute our judgment for that of the orphans' court. However, it is beyond our purview to disturb the credibility determinations of the orphans' court when the testimony relied upon is supported in the record. *See In re T.S.M.*, *supra* at 267. CYS presented evidence of Mother's repeated and continued incapacity due to her mental health problems and substance abuse that caused C.K. to be without essential parental care, control or subsistence since 2013. While Mother attempted to whitewash her auditory hallucinations and adduce countervailing evidence that she addressed her mental health concerns, the orphans' court rejected those contentions in favor of the three expert opinions proffered by the learned mental health professionals. Significantly, the orphans' court noted,

> The Court also observed the Natural Mother testify on two occasions. Once at a permanency review hearing and once at a hearing on a Voluntary Relinquishment. On both occasions, the Court judged the Mother to exhibit significant mental health concerns and she seemed unable to demonstrate clarity or consistency of thought. This lends significant credibility to the testimony of the aforementioned experts.

Orphans' Court Statement in Lieu of Opinion, 3/12/18, unnumbered at 2 (paragraph number omitted).

Mother's argument relative to § 2511(b) fares no better. Stated plainly, the certified record belies Mother's assertion that her interaction with C.K. during the bonding assessment could possibly reveal a healthy attachment. While Mother concentrates on evidence that the two played well together, she

- 13 -

ignores the decisive fact that C.K. did not view her as a primary attachment, as evidenced by his easy separation from her following the interactional portion of the assessment. N.T., 11/12/15, at 147. Furthermore, Dr. Shienvold proffered an explanation for the absence of an attachment, *i.e.*, Mother's behaviors throughout the dependency proceedings destabilized the underpinnings that the attachment needed to form. *Id*. at 150-51. Ultimately, he indicated that children in C.K.'s position form bonds with their primary caretakers. *Id*. at 151. Hence, C.K. formed a primary attachment with his kinship foster parents with whom he has lived since October 2015.

In sum, the orphans' court could have viewed favorably Mother's attempts to undercut CYS's evidence and/or adopt Mother's position regarding Dr. Shienvold's interactional evaluation. However, it did neither. Instead, the orphans' court concluded that Mother failed to remedy the substance abuse and mental health problems that caused the parental incapacity, and found that terminating Mother's parental rights served C.K.'s developmental, physical, and emotional needs and welfare. As the certified record supports the orphans' court's findings, we do not disturb them.

Accordingly, we conclude that the trial court did not err in finding that CYS established the statutory grounds to terminate parental rights pursuant to 2511(a)(2) and (b). *See In re T.S.M.*, *supra*; *In re J.M.*, 89 A.3d 688, 692 (Pa.Super. 2014) ("Conflicts in the evidence and contradictions in the

testimony of any witnesses are for the fact finder to resolve.") (citation omitted).

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/21/2019