J-S31030-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.A.D., JR. | : | IN THE SUPERIOR COURT |
| | : | OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.P. | : | No. 357 WDA 2019 |

Appeal from the Decree December 27, 2018
In the Court of Common Pleas of Clearfield County
Orphans' Court at No:  3420-2017-OC

BEFORE:  OLSON, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY STABILE, J.:                **FILED  AUGUST 27, 2019**

B.P. ("Mother") appeals from the decree entered December 27, 2018, which terminated involuntarily her parental rights to her minor son, J.A.D., Jr. ("Child"), born in March 2012.[1]  After careful review, we affirm.

The record reveals that Mother has a lengthy history of involvement with Clearfield County Children, Youth and Families ("CYF") dating back to 2014. Although the details are not entirely clear, the juvenile court adjudicated Child dependent in approximately September 2014, based on Mother's drug use, poor supervision, and lack of cooperation with CYF.  N.T., 9/26/18, at 18-19. Mother initially remedied her lack of cooperation and alleviated CYF's concerns

_____

[1] The orphans' court entered a decree on October 9, 2017, confirming the consent and terminating the parental rights of Child's presumptive father, C.P., Jr., who was married to Mother at the time of Child's birth.  The court also entered a decree on September 27, 2018, terminating involuntarily the parental rights of Child's natural father, J.A.D., Sr.  Neither individual appealed the termination of his parental rights.

with the assistance of her boyfriend, J.W. *Id.* at 19, 40. Child's dependency ended and he returned to Mother's care in February 2015. *Id.* at 19.

However, an incident took place in March 2015, which revived CYF's concerns. An employee from Children's Aid Society was assisting Mother that day by providing her with transportation to a public assistance appointment and to the store. *Id.* at 66-67. Mother fell asleep repeatedly during the trip, at one point even falling asleep "in the cereal aisle . . . sleeping standing up with her head down." *Id.* at 67-68. The employee drove Mother to the CYF office and called the police, who then took Mother into custody, apparently on suspicion of public intoxication.[2] *Id.* at 68-70.

Once again, the details are not entirely clear from the record, but it appears that Child went to live with J.W. following this incident, because CYF believed that he was Child's natural father.[3] *Id.* at 20, 40-41. Child remained with J.W. until November 24, 2015. *Id.* at 20. J.W. was set to be incarcerated due to an incident of drug use and he brought Child to CYF because he did not believe that Mother could provide appropriate parental care. *Id.* at 20, 40. CYF agreed with J.W.'s assessment, because two of Mother's other children were in foster care at that time. *Id.* at 41. In addition, Mother had become uncooperative and her drug use remained unresolved. *Id.* The juvenile court adjudicated Child dependent and he has remained in foster care continuously

---

[2] Our review of the record does not reveal whether Mother incurred criminal charges.

[3] J.W. was no longer in a relationship with Mother. N.T., 9/26/18, at 40.

since that time. On February 6, 2017, the court changed Child's permanent placement goal to adoption. *Id.* at 21.

On July 13, 2017, CYF filed a petition to terminate Mother's parental rights to Child involuntarily. CYF later filed a motion asking that the orphans' court cancel the hearing scheduled on the petition, because it discovered that Child's biological father was J.A.D., Sr., rather than J.W. The court granted CYF's motion. CYF filed a second termination petition on July 12, 2018, and the court held a hearing on September 26, 2018.[4] Following the hearing, on

_____

[4] The orphans' court appointed a separate legal counsel and guardian *ad litem* to represent Child during the proceedings. Counsel stated during the hearing that Child's preferred outcome was to remain in his current placement. N.T., 9/26/18, at 13. Counsel filed a brief supporting termination on appeal, which includes the following description of her meeting with Child:

> Given his age at the time, I engaged the child in various questions regarding his biological mother . . . . [W]hen asked about his mother, [Child] seemed confused about who she was. He did not readily associate [Mother] as his mother. When I used her name and not the term "Mother", he appeared to know who she was and became visibly uncomfortable. This demeanor continued until the topic of Mother was over. [Child] could not recall the last time he saw her and expressed no desire of wanting to see her. When asked if he would want to have visits with her, he indicated only "if he had to."
>
> When asked about family, the child was clear that he enjoyed being with his foster parents and two half-brothers and he hoped he could stay with them. He was excited to tell me about his school and accomplishments. He did not waiver on his desire for things to remain the way they are. He was clear he wanted the Court to know he was happy and liked things how they were.

Child's Brief at 5-6.

December 27, 2018, the court entered a decree terminating Mother's rights. Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal, on January 25, 2019.

Mother raises the following claim for our review: "Whether the [orphans' c]ourt erred in terminating Mother's parental rights when evidence was presented that Mother was not evidencing a settled purpose to relinquish her parental claims to [Child?]" Mother's Brief at 7.

We consider this claim mindful of our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of

the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the orphans' court terminated Mother's parental rights involuntarily pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a) in order to affirm.[5] *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate pursuant to Section 2511(a)(2), which provides as follows:[6]

---

[5] We note that the orphans' court erred by terminating Mother's parental rights pursuant to Sections 2511(a)(5) and (8). Both of those sections require that the subject child have "been removed from the care of the parent by the court or under a voluntary agreement with an agency" in order to be applicable. 23 Pa.C.S.A. § 2511(a)(5), (8). Because the record appears to indicate that CYF removed Child from J.W.'s care, rather than Mother's care, the court could not terminate Mother's parental rights pursuant to those sections. *See In re C.S.*, 761 A.2d 1197, 1200 (Pa. Super. 2000) (*en banc*) (concluding that termination was inappropriate under Sections 2511(a)(5) and (8) "because the record reflects that C.S. was never in Appellant's care and, therefore, could not have been removed from his care.").

[6] Mother waived any challenge regarding Section 2511(b) by failing to include it in her statement of questions involved and in her concise statement of errors complained of on appeal. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]ssues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived."). Mother also failed to develop any such claim in the argument

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

23 Pa.C.S.A. § 2511(a)(2).

We apply the following analysis when considering whether the orphans'

court committed an abuse of discretion pursuant to Section 2511(a)(2):

…. In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence

_____

section of her brief. ***Id.*** at 465-66 ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority."). Thus, we review only the decision of the orphans' court to terminate parental rights pursuant to Section 2511(a).

Even considering the merits of Section 2511(b), we would conclude that the record overwhelmingly supports the finding that termination of Mother's parental rights would best serve Child's needs and welfare. Psychologist Allen H. Ryen, Ph.D., conducted a bonding evaluation and concluded that while "early primary bonds were established between [M]other and [Child] in this case, [] it's been degraded in the interim and . . . it's no longer a secure bond, it's not a healthy bond. In fact, it may be a pathological bond." N.T., 9/26/18, at 82. The record also reveals that Child is in a pre-adoptive foster home and that he appears to share a bond with his foster parents. ***Id.*** at 34-35, 75-76, 83, 90.

necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In its opinion, the orphans' court found that Mother made some initial progress after Child's first adjudication of dependency in 2014 but that her progress declined sharply after his second adjudication of dependency in 2015. Orphans' Court Opinion, 12/27/18, at 9. The court explained that Mother has been unable or unwilling to remedy her drug abuse concerns, locate appropriate housing, or cooperate with service providers. *Id.* at 9-10. In addition, the court explained that Mother lacks adequate parenting skills. *Id.* at 10. The court concluded, "[b]ecause the causes or conditions of Mother's clear incapacity or neglect have not been remedied by Mother, who also shows no desire to remedy such incapacity or neglect, this Court is satisfied that termination of parental rights under 23 Pa.C.S.A. §[]2511(a)(2) is warranted." *Id.* at 10-11.

Mother, however, contends that the orphans' court erred by terminating her parental rights because CYF relied on "testimony reflecting circumstances well outside any relevant timeframes," including events occurring two and a

half to three years in the past. Mother's Brief at 9, 18-22. Mother also maintains that it was error for the court to terminate her parental rights because CYF denied her the opportunity to visit with Child. *Id.* at 9, 12-20. She highlights her own testimony from the termination hearing that CYF resisted her requests for visits. *Id.* at 13, 18.

The record supports the findings and conclusions of the orphans' court. Caseworker Debbie Myers testified that CYF created a series of objectives for Mother to complete in order to regain custody of Child. These included: (1) cooperating with CYF (2) attending a nurturing program (3) attending a mental health evaluation and following the recommendations of the evaluation (4) attending Child's doctor and dentist appointments (5) attending drug and alcohol treatment (6) signing releases for all doctors and pharmacies (7) submitting to random announced and unannounced drug tests (8) allowing random pill counts (9) allowing CYF to conduct announced and unannounced visits at her home (10) maintaining a home environment that is free of any safety or health hazards and (11) attending visits. N.T., 9/26/18, at 22.

Concerning Mother's compliance with her objectives, Ms. Myers testified that she was uncooperative with CYF and failed to maintain contact for months at a time. *Id.* at 22, 32-33. In addition, CYF had no knowledge of Mother attending a nurturing program or mental health evaluation. *Id.* at 22, 41-42. Ms. Myers did not recall Mother attending any doctor or dentist appointments. *Id.* at 22-23.

As for Mother's drug and alcohol objective, Ms. Myers testified that she attended a treatment program. *Id.* at 27-28. Mother initially complied with treatment but her compliance declined. *Id.* at 22. By September 6, 2017, a report from Mother's treatment program indicated that her progress was unsatisfactory. *Id.* at 27, 37. Mother also signed releases, but revoked those releases in approximately 2017. *Id.* at 23, 42. Further, Ms. Myers explained that Mother failed to comply with her drug test objective, in that her tests "were basically announced because I would card her door[7] and then she would come to the agency when it was of convenience to her." *Id.* at 23. Ms. Myers added that Mother never had her pill bottles with her so that she could to perform a pill count. *Id.* Most recently, Mother tested positive for Subutex on August 30, 2018, while incarcerated.[8] *Id.* at 29. Ms. Myers explained that Mother reportedly received the Subutex from another inmate. *Id.* at 29, 43.

Regarding visits at Mother's home, Ms. Myers testified that they "were very, very sporadic." *Id.* at 22. Ms. Myers explained that Mother also failed to maintain an appropriate home environment. Previously, Mother resided at Lawrence Park Village. *Id.* at 23. Ms. Myers recalled that Mother generally

---

[7] Ms. Myers did not explain CYF's drug-testing procedure, nor did she clarify what precisely "carding" Mother's door consisted of.

[8] Mother testified that she has pending criminal charges for driving under the influence. N.T., 9/26/18, at 103.

kept her residence there "very nice." *Id.* However, on one occasion, Ms. Myers visited the residence and discovered "a baby's bassinet . . . filled with prescriptions."[9] *Id.* at 31. She noted that some of the prescriptions belonged to Mother but that others belonged "to other people." *Id.* Mother was later evicted from Lawrence Park Village due to a positive drug test and because she had an unpaid electric bill for $3,000. *Id.* at 38. Mother then went to live with a man named A.A., whose home was "very unsafe." *Id.* at 23. Ms. Myers testified concerning a series of photographs she took while visiting the home, depicting "trash all over. . . . stuff piled up. More garbage. Stuff hanging out of the house." *Id.* at 32. After Mother left A.A.'s home, CYF had no record of her location. *Id.* at 23.

Finally, Ms. Myers testified that Mother has had a total of four visits with Child since November 2015, the last of which was a bonding assessment on February 28, 2017. *Id.* at 33-36. CYF provided Mother with services from both Children's Aid Society and CenClear to assist her with visits. *Id.* at 25. However, Mother was noncompliant.[10] *Id.* at 26. Ms. Myers explained that

---

[9] More specifically, Ms. Myers discovered a bassinet containing prescription pill bottles. She took a picture of the bassinet, which the orphans' court entered into evidence as Petitioner's Exhibit 7. The exhibit appears in the certified record. Upon review, it depicts a bassinet containing approximately ten pill bottles.

[10] Christina Woodel, the family support services manager from Children's Aid Society, testified that her organization offered Mother weekly visits with Child from March 2016 to May 2016, but that Mother attended only two of the visits

CYF was not currently offering visits to Mother because "we've had no contact with mom, no compliance from her. I mean, we don't even -- if she isn't in Clearfield County Jail, we don't even know where she's at." *Id.* at 34.

Thus, the record confirms that Mother is incapable of parenting Child and cannot or will not remedy her parental incapacity. By the time of the hearing, Child had been adjudicated dependent twice and spent over three years of his life in foster care. Meanwhile, Mother failed dramatically to comply with her reunification objectives. Mother continued to produce positive drug tests, even producing a positive test while incarcerated on pending criminal charges. Mother also lacked suitable housing and failed to visit with Child. It is apparent that CYF's evidence did not relate solely to events that occurred two and a half to three years in the past as Mother alleges. Rather, the evidence described Mother's ongoing parental incapacity, which continued to the present day.

While Mother also maintains on appeal that she was unable to comply with her reunification objectives because CYF did not offer her visits with Child, this argument is clearly specious. As stated above, the record reveals that CYF did offer visits to Mother, but that she failed to attend consistently and did not contact CYF for months at a time. The orphans' court was free to

---

on May 2, 2016 and May 9, 2016. N.T., 9/26/18, at 51-52. Ms. Myers added that CenClear offered five visits to Mother between May and July 2016, but that Mother attended only one visit on June 27, 2016. *Id.* at 26.

reject Mother's testimony that CYF denied her request for additional visits as incredible. ***See In the Interest of D.F.***, 165 A.3d 960, 966 (Pa. Super. 2017) ("The [o]rphans' [c]ourt is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."). CYF cannot force Mother to attend visits if she does not cooperate and make herself available. Even if CYF were somehow at fault for Mother's lack of visits with Child, that would not excuse her failure to comply with her other reunification objectives by addressing her drug use, and obtaining safe and appropriate housing, among other things. We conclude that Mother is not entitled to relief.

Based on the foregoing, the orphans' court did not abuse its discretion or commit an error of law by terminating Mother's parental rights to Child involuntarily. Therefore, we affirm the court's December 27, 2018 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/27/2019

- 12 -