J-S30002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.W., FATHER | No. 1254 EDA 2022 |

Appeal from the Decree Entered April 4, 2022
In the Court of Common Pleas of Monroe County
Orphans' Court at No.: 2021-00057

BEFORE:  STABILE, J., MCCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY STABILE, J.:                **FILED NOVEMBER 7, 2022**

Appellant A.W. ("Father") appeals from the decree entered on April 4, 2022 in the Court of Common Pleas of Monroe County ("orphans' court"), which terminated involuntarily his parental rights to his son, J.L. ("Child"), born in September 2011.  Upon review, we affirm.

Unless otherwise stated, the facts and procedural history are taken from the orphans' court's detailed Pa.R.A.P. 1925(a) opinion.  **See** Orphans' Court's Opinion, 6/13/22, at 1-13.  Briefly, while in prison, D.B. ("Mother") gave birth to Child, who then was placed with an Amish Family in Mercer County through a private arrangement.  Upon parole, Mother gained custody of Child.  When Mother violated parole and returned to prison, Child lived with his maternal grandmother in Monroe County until maternal grandmother sent Child back to

_____

[*] Retired Senior Judge assigned to the Superior Court.

reside with the Amish family. When Mother was re-paroled, the Amish family refused to return Child to Mother. Instead, the Amish family sought custody and petitioned to involuntarily terminate Mother's parental rights.[1] This Court eventually affirmed the Mercer County trial court's ruling that the Amish family lacked standing. This period of Child's life when he was in the care of the Amish family was extremely traumatic.

In January 2018, around the time custody of Child was returned to Mother from the Amish family, CYS received a referral that Mother had given birth to a younger half-sibling who tested positive for drugs. At the time, the family was residing in Northampton County, where the referral was handled.

In September 2018, after the family moved to Monroe County, CYS received a referral regarding drug use by Mother and her husband (step-father). At that time, Child and other family members were residing with maternal grandmother. On October 31, 2018, Child was adjudicated dependent and since then, has remained in the care of CYS.

After being adjudicated dependent, Child, for a period of thirteen months, was placed with his maternal grandmother whom CYS identified as a kinship resource. Maternal grandmother eventually asked CYS that Child be removed from her care because she could not handle his behaviors.

---

[1] During the pendency of the Mercer County proceedings, the family remained on Monroe County Children and Youth Services' ("CYS") radar. In December 2014, CYS received a referral that Mother had given birth to another child, L.R., who had been born dependent on drugs. Consequently, Mother's parental rights to L.R. were terminated and this Court affirmed the termination decree.

In October 2019, Child was moved to his current pre-adoptive home. On January 29, 2020, the permanency goal in the dependency proceedings was changed to termination and adoption.

For the majority of Child's life, Father was unaware of Child's existence. According to Father, he did not know he was Child's parent until sometime in February 2018 when his girlfriend sent him a photograph of Child from which he "knew" he was Child's father. Officially, Father's paternity was established in March 2019 following his receipt of DNA test results. Nonetheless, Father's lack of knowledge was, at least in large part, due to the fact that, while others were raising Child, Father has either been in jail in Florida or hiding from the law in the Dominican Republic.

In fact, prior to Child's birth, on March 2, 2009, and again on November 17, 2009, Father was arrested in Florida on drug charges to which he later pleaded guilty. Father was released on bail. On April 21, 2011, Father "jumped bail" and fled to the Dominican Republic where he hid for almost five and one-half years. While in hiding, Father maintained a relationship with his girlfriend who is the mother of one of Child's half-siblings, a sibling Child has never met. On September 21, 2016, Father turned himself in and ultimately pleaded guilty to drug possession and trafficking charges. On February 17, 2022, Father was sentenced to a lengthy term of incarceration. Specifically, his maximum sentence expires in 2053, but his current anticipated release date is August 10, 2039, when Child will be almost twenty-eight years old. Father has been in prison since he turned himself in.

On November 8, 2021, CYS filed the instant petition to terminate involuntarily Father's parental rights to Child under 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8).[2] Child was provided a guardian *ad litem*. The orphans' court conducted a hearing, at which Father testified that, since his paternity was established, he sent Child cards, letters and drawings and his mother (paternal grandmother) provided additional contacts and possibly some gifts. Further, Father testified that he spoke with CYS caseworkers on a few occasions, and requested information about phone contact with Child. According to Father, he earned a GED and completed drug prevention and life skills classes while in prison.

Following the hearing, the orphans' court granted CYS's petition to terminate involuntarily Father's parental rights under Section 2511(a)(1), (2), (5) and (8). In so doing, the court specifically found as incredible Father's testimony.

> Through his broad-scope testimony, Father attempted to paint the picture that he has made meaningful attempts to establish and maintain a relationship with [Child] from jail. However, the impression Father tried to leave is not supported by the facts.
>
> Among other things, the classes taken by Father were completed prior to the date Father claims he discovered [Child] was his son. Additionally, Father has not provided [CYS] with written confirmation that he in fact finished the classes.
>
> Father testified that when [Child] was in the care of maternal grandparents he spoke with [Child] daily by phone. This

---

[2] CYS also petitioned to terminate involuntarily Mother's parental rights to Child, but Mother voluntarily relinquished them. N.T., Hearing, 4/4/22, at 36.

claim is not supported by any other evidence. At best, Father grossly exaggerated the frequency, duration, and substance of any contact or communication Father may have had with maternal grandparents or [Child] while [Child] was in their care. In this regard, while Father would have the [c]ourt believe that he was able to speak daily with [Child] from jail during 2018 or 2019, he has for unexplained reasons since then been unable to find a way to speak or visit with [Child] by phone, [alternative communication technology (ACT)], or other means despite the fact that CYS asked Father to provide them information as to how such contact or visits could be set up. Along similar lines, [Child's] caseworker sent to Father's prison counselors ACT links for review hearings so that Father could participate remotely. Father did not take advantage of the opportunities and did not participate in review hearings.

The bottom line is that while others cared for and raised [Child], Father has for [Child's] entire life either been in jail or running from the law. He has never met [Child] in person, or even by video. He has simply not been a part of [Child's] life. Father's testimony about efforts to have contact with [Child] is nothing more than an attempt to stave off termination of parental rights by claiming to have checked off some boxes. Tellingly, although the cards and gifts from Father were given to him, [Child] did not respond and has indicated that he does not at this time want to have contact with Father. Simply, there is no relationship, parental or otherwise, between Father and [Child]. In fact, the possibility of visits caused [Child] stress.

Orphans' Court Opinion, 6/13/22, at 11-12. Father timely appealed. Both Father and the orphans' court complied with Rule 1925.

On appeal, Father argues only that the orphans' court erred in granting CYS's petition to terminate involuntarily his parental rights to Child under 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8). Father's Brief at 4 (unnecessary capitalizations omitted).[3]

---

[3] Child's guardian *ad litem* did not file a separate brief in this appeal.

We review Father's claims in accordance with the following standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights to Child pursuant to subsection 2511(a)(1), (2), (5), (8), and (b).[4] We need only agree with the court as to any one subsection of 2511(a), as well as subsection 2511(b), to affirm. **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), **appeal denied**, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision only pursuant to Section 2511(a)(2), which provides as follows.[5]

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child

---

[4] Section 2511(a)(5) and (8) require that "[t]he child has been removed from the care of the parent." 23 Pa.C.S.A. § 2511(a)(5), (8). An *en banc* panel of this Court has held that termination under these two subsections is inappropriate where the record shows that the child was never in the parent's care, and therefore could not have been "removed" from their care. **Interest of C.S.**, 761 A.2d 1197, 1200 n.5 (Pa. Super. 2000) (*en banc*). Here, it is undisputed that Child was never in Father's care, as Father was either in hiding in the Dominican Republic or incarcerated since Child's birth.

[5] By failing to state an issue or developing a challenge related to the orphans' court's determinations under Section 2511(b), Father has waived any Section 2511(b) claims. **See In re M.Z.T.M.W.**, 163 A.3d 462, 465 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority."). Even if Father had preserved a challenge to Section 2511(b), we still would conclude that it is without merit. The orphans' court found that other than a biological connection, "there is no bond between [Child] and Father." Orphans' Court Opinion, 6/13/22, at 30. On the contrary, Child "is doing extremely well in his pre-adoptive foster home and has an amazingly healthy and strong bond with his foster family who have provided him with the love, support, nurturing, and care that Father has been unable to give." **Id.** at 29.

> to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

We begin by assessing whether the orphans' court committed an abuse of discretion by terminating Father's rights to Child pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).[6] As we recently explained in *In re Adoption of K.M.G.*, 219 A.3d 662 (Pa. Super. 2019) (*en banc*):

> The grounds for termination under Section 2511(a)(2) are not limited to a parent's affirmative misconduct, but rather a parental incapacity that a parent cannot remedy. Parents have

---

[6] Although not relevant to the disposition of this appeal, the Supreme Court recently overruled on other grounds *A.L.D.* in *In re S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021).

an "affirmative duty" to work towards the return of their children. This "affirmative duty," at a minimum, requires a parent to cooperate with the Child and Youth Agencies and complete the rehabilitative services necessary so that the parent can perform his parental duties and responsibilities.

Additionally, the statute **does not provide a parent with an unlimited period [of] time to overcome the incapacity that led to the adjudication of the child; rather, a parent must make a diligent effort towards overcoming the incapacity so that the parent can assume his parental duties within a reasonable period of time after the adjudication of dependency**.

This Court has explained, Section 2511(a)(2) does not focus on a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, when addressing the requirements of Subsection (a)(2), the orphans' court should not ignore a child's need for a stable home and strong, continuous parental ties. This factor is particularly important when the disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

**K.M.G.**, 219 A.3d at 672-73 (quotation marks, citations and brackets omitted) (emphasis added).

In **In re Adoption of S.P.**, 47 A.3d 817 (Pa. 2012), our Supreme Court addressed the relevance of incarceration in termination decisions under Section 2511(a)(2). The Court held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." **Id.** at 828.

Here, the certified record reveals a repeated and continued parental incapacity based upon Father's enduring criminal conduct and incarceration since prior to the time of Child's birth. That incapacity has caused Child to be without essential parental care. As the orphans' court found, and detailed above, Father first became aware of Child's existence in February 2018 and Father's paternity was established conclusively in March 2019. Prior to Child's birth, Father fled to the Dominican Republic where he was hiding from the authorities after jumping bail. In 2016, when Child was five years old, Father turned himself in and since then has remained in prison. His maximum sentence expires in 2053, but his current anticipated release date is August 10, 2039, when Child will be almost twenty-eight years old. Although he sent letters and cards to Child and communicated with him in 2018 and/or 2019, Father has not had any contact with Child since then. As the orphans' court explained:

> Father has had only minimal contacts with [Child] consisting of a handful of phone calls and some cards and letters. However, Father has done nothing else to promote the mental, physical, spiritual or emotional well-being of [Child]. Rather, since [Child] was born, persons other than Father have provided nurturing and care for [Child] and have ensured that [Child's] physical, mental, emotional, medical, developmental, and daily needs have been met.

Orphans' Court Opinion, 6/13/22, at 28. While Father claims he completed certain classes, he never furnished proof of completion to CYS. Additionally, despite being informed, Father failed to participate in any permanency review hearings. Thus, as stated, the record demonstrates that Father's repeated

and continued incapacity due to his incarceration has caused Child, for the entirety of his life, to be without essential parental care, control, or subsistence necessary for his physical or mental well-being. Because of his lengthy prison sentence, Father's incapacity cannot or will not be remedied. Thus, we discern no abuse of discretion by the orphans' court terminating Father's parental rights pursuant to Section 2511(a)(2). Accordingly, in light of the evidence adduced at the termination hearing, the orphans' court did not abuse its discretion in granting CYS's termination petition under subsection 2511(a)(2). We, therefore, affirm the orphans' court's April 4, 2022 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/7/2022

- 11 -